(42 South. 249.)

No. 16,342.

SCHAUB v. SCHAUB.

(Nov. 12, 1906. On Rehearing, Nov. 26, 1906.)

1. DIVORCE—DRUNKENNESS.

"Habitual intemperance" as a ground for separation from bed and board means the custom or habit of getting drunk. Ordinary beer drinking, short of intoxication, furnishes no ground for such a charge.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 17, Divorce, §§ 40–45.]

2. SAME—RECONCILIATION.

The action of separation is extinguished by the reconciliation of the parties after the facts which might have given ground to such action. Civ. Code, art. 152.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 17, Divorce, §§ 180–187.]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by George M. Schaub against Ida M. Schaub, née Sintes. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

George Joseph Untereiner, for appellant. John Darling Nix and Rolla Absolam Tichenor, for appellee.

LAND, J. Plaintiff and defendant were married in 1901, and one child was the issue of the marriage. In January, 1906, plaintiff sued for a separation from bed and board on the ground that the defendant had, without just cause, abandoned the matrimonial domicile on or about November 6, 1905, and had continued to remain away. The defendant was summoned to return to the matrimonial domicile without delay. On the service of the first summons, defendant appeared and in her answer, after pleading the general issue, admitted the alleged marriage and the alleged abandonment with the full intention of never returning, but averred that she was justified in so doing because of her husband's habitual intemperance and his cruel treatment of respondent, which rendered their living together insupportable. The answer further averred that soon after the marriage the husband became addicted to the use of alcoholic drinks, would come home intoxicated, and at times would remain out all night, carousing with disreputable persons and gambling at cards; that while under the influence of liquor his treatment of the respondent was cruel; that in February, 1903, during one of his sprees, he struck defendant with his fist, causing her great pain and suffering, and shortly afterwards threatened to take her life; that his insults and curses were of weekly and sometimes daily occurrence; that her husband frequently ordered respondent out of his house, and in May, 1905, brought her to her father's home and bid her stay there, "and about the 6th day of November, 1905, respondent and her said husband separated and have been living apart ever since." It is evident from the allegations of the answer that after May, 1905, the wife returned to the matrimonial domicile, and that the parties were living together as husband and wife on or about November 6, 1905. There was judgment in favor of the defendant, granting her a divorce a mensa et thoro, and subsequently she obtained judgment for alimony. Plaintiff has appealed from both judgments.

The evidence shows that plaintiff and respondent were living together at his grandmother's when the final separation took place. The wife left the house in the absence of the husband, and the record fails to disclose any cause for her departure beyond a hearsay statement of a quarrel about money. Her father testified that respondent came to his house on November 6, 1905, and said that "she was compelled to leave there." This witness frankly confessed that he personally knew nothing of the troubles between the parties, except what occurred during May, 1905, and it inferentially appears

from his rather confused answers that the plaintiff, at that time, made some accusation against his wife and took her to her father's house, but, finding that he could not prove the charge, "took her back on the same night."

The same witness testified that he never saw the plaintiff actually drunk, but many times prior to May, 1905, saw him so full that "he did not know when to stop talking." The witness further stated, when the parties lived next door, he "could hear the noise of fussing and fighting in there."

A sister of the defendant testified to the effect that she never saw plaintiff "what you might call drunk," but had seen him under the influence of liquor enough "to make him fuss and make him disagreeable," and that she often stayed with her sister and plaintiff to "avoid trouble between them." This witness testified that on July 2, 1905, she saw plaintiff and his uncle go into a barroom, and that the uncle got shot and the plaintiff was arrested for gambling. This witness does not know of any trouble between the parties later than May, 1905. Another witness for defendant testified that she was well acquainted with the parties and that they had visited her house very often; that plaintiff almost daily visited a certain barroom, but she had never seen him drunk or under the influence of liquor; and that she never knew of any trouble between them. One Carey testified that plaintiff was all the time in the barroom when he knocked off work, but he does not state that he ever saw plaintiff intoxicated. It may be here stated that plaintiff was a conductor and subsequently a motorman on the street railroad. Another sister of the defendant testified that in February, 1903, plaintiff came home drunk, cursed and abused the defendant, and shoved her against the kitchen door, and that since that date she has had no opportunity to observe his conduct towards his wife. Another female witness for the defendant, who had known plaintiff about five years, testified that he frequented barrooms, but she never saw him drunk. Defendant called the barkeeper as witness, who also testified that he had never seen the plaintiff drunk; that the plaintiff always drank beer, and would sometimes visit the saloon two, three, or four times in one day, and usually spent his evenings there and played cards for drinks.

Two aunts of the plaintiff and a lifelong friend testified that they had never seen the plaintiff intoxicated.

The evidence shows that plaintiff was a frequenter of barrooms in his hours of leisure, and drank beer, not however to the degree of intoxication. The most that can be said is that plaintiff at times was under the influence of drink to the point of loquacity or of ill humor. There is nothing to show, however, that his usual mental condition was abnormal or that he was at all incapacitated for his daily work.

In Mack v. Handy, 39 La. Ann. 497, 2 South. 183, the court said:

"The phrase 'habitual intemperance' scarcely requires an interpretation. It is easily understood. It means the custom or habit of getting drunk; the constant indulgence in such stimulants as wine, brandy, and whisky, whereby intoxication is produced; not the ordinary use, but the habitual abuse of them. The habit should be actual and confirmed."

See, also, De Lesdernier v. De Lesdernier, 45 La. Ann. 1364, 14 South. 191.

The evidence totally fails to show "habitual intemperance" in the sense of the law. The evidence as to cruel treatment goes back to February, 1903, and it is patent that the defendant condoned the offense by continuing to live thereafter with her husband for more than two years. The trouble of May, 1905, seems to have been amicably arranged to the satisfaction of the parties concerned. There is not a particle of evidence to show any personal trouble between May and November.

Why the defendant abruptly left her husband's house on November 6, 1905, is not explained. There is little or no evidence as to the plaintiff's drinking habits after the tragedy of July 2, 1905, and not a single witness testified that he was drinking at all during September, October, and November, 1905.

The evidence does not show that the defendant was justified in abandoning the matrimonial domicile on November 6th, or that she is entitled to a separation from bed and board. Divorces should not be granted, except in clear cases.

It is therefore ordered that the judgment appealed from be annulled, avoided, and reversed, and it is now ordered that the defendant's reconventional demand be dismissed, with costs, and that this cause be remanded for the service of notices and for further proceedings according to law, and that the defendant pay the costs of appeal.

## On Rehearing.

PER CURIAM. The decree is amended so as to reverse the judgment for alimony, and with this amendment the applications for a rehearing are refused.