(116 So. 549)

No. 28804.

**SAINT, Attorney General, v. IRION, Commissioner of Conservation.**

March 12, 1928.

*(Syllabus by Editorial Staff.)*

1. States ⚖=52—Evidence held not to sustain charge that Commissioner of Conservation sought to be removed bought ducks in violation of law (Const. art. 9, § 6).

In proceedings under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence *held* not to sustain charge that defendant bought ducks in violation of the Conservation Law.

2. States ⚖=52—Commissioner of Conservation is state officer subject to removal for any of causes enumerated in Constitution (Const. art. 5, §§ 1, 18, art. 9, § 1).

The Commissioner of Conservation being under Const. art. 5, §§ 1, 18, an officer of the executive department of the state government appointed by the governor, he is a state officer subject to removal from office for any of causes enumerated in article 9, § 1.

3. States ⚖=52—Ordinary drinking, short of intoxication, or mere possession or transportation of intoxicating liquor, is not "habitual drunkenness," authorizing removal of officer (Const. art. 9, § 1).

Ordinary drinking, short of intoxication, or mere possession or transportation of intoxicating liquor for beverage purposes, does not constitute "habitual drunkenness," within Const. art. 9, § 1, enumerating habitual drunkenness as one of grounds for removal of state or district officers.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Habitual Drunkenness or Intoxication.]

4. States ⚖=52—Proceeding for removal of state officer, is a civil and not a criminal proceeding (Const. art. 9, § 6).

Proceeding under Const. art. 9, § 6, for removal of a state officer, is not a criminal but a civil proceeding.

5. States ⚖=52—Possession of small quantity of prescription whisky on conservation boat held not to sustain charges of "habitual drunkenness" or "gross misconduct," authorizing removal of Commissioner of Conservation (Const. art. 9, §§ 1, 6).

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence that defendant had in his possession the remnants of a pint bottle of prescription whisky aboard a conservation boat, and divided its contents among members of crew, and that some of guests brought their whisky with them, there being no evidence of drunkenness, *held* not to constitute "habitual drunkenness" or "gross misconduct," within Const. art. 9, § 1, authorizing removal of state officers on such grounds; "gross misconduct" meaning official misconduct or habitual vice.

**6. States** ⊛⟶52—**Conviction for violation of Prohibition Law is not for crime involving "moral turpitude" (Act No. 39 of 1921).**

Conviction for violation of the Prohibition Law (Act No. 39 of 1921) is not such conviction of crime as involves "moral turpitude."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moral Turpitude.]

**7. States** ⊛⟶52—**That Commissioner of Conservation took friends and members of family on outings with conservation boats and charged expenses to conservation department held not to require his removal (Const. art. 9, § 6).**

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence that defendant invited friends and members of family on trips in conservation boats for outings and charged expenses of such trips to conservation department *held* not to show such gross fault or grave misconduct as to amount to moral turpitude requiring defendant's removal from office.

**8. States** ⊛⟶52—**Evidence held not to show misconduct by Commissioner of Conservation in charging expenses for garage rent, gasoline, and auto supplies to conservation department (Const. art. 9, § 6).**

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence *held* not to show any wrongful conduct on defendant's part in charging to conservation department expenses for garage rent, gasoline, and auto supplies.

**9. States** ⊛⟶52—**In removal proceeding, evidence held not to show that Commissioner of Conservation carried "deadheads" on pay roll of department (Const. art. 9, § 6; Act 57 of 1888, § 2).**

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence that defendant in good faith entered into agreement with father of one of employees who had been sentenced to jail to continue paying employee's salary while he was in jail on condition that father continue his son's work *held* not to sustain charge that defendant carried "deadheads" on pay roll of conservation department in violation of Act No. 57 of 1888, § 2.

**10. States** ⊛⟶52—**Evidence held not to show mismanagement by Commissioner of Conservation in administration of finances of department or extravagant expenditures (Const. art. 9, § 6).**

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence *held* not to sustain charges of mismanagement in administration of finances of department or of extravagant expenditures; there being no proof of fraud, bad faith, or improper motives on part of defendant.

**11. Officers** ⊛⟶103—**Court will not control discretion of public officer or board unless arbitrarily or fraudulently exercised.**

Supreme Court will not undertake to control the discretion of a public officer or board unless arbitrarily or fraudulently exercised.

**12. States** ⊛⟶52—**That Commissioner of Conservation opposed carbon black legislation of 1926 constitutes no ground for removal (Const. art. 9, § 6, art. 6, § 1).**

That Commissioner of Conservation opposed the carbon black legislation of 1926 constitutes no ground for removal from office, under Const. art. 9, § 6, as defendant cannot be held legally accountable therefor, since under article 6, § 1, Legislature alone has the sole duty and responsibility in the matter of enactment of all necessary conservation laws.

**13. Officers** ⊛⟶30—**That Commissioner of Conservation was also secretary of state dental board did not constitute holding at same time more than one "office of profit," in violation of Constitution (Const. art. 19, § 4).**

That Commissioner of Conservation also held and exercised office of secretary of the state dental board did not constitute a holding at the same time of more than one office of profit, in violation of Const. art. 19, § 4, since the office of secretary is in no proper legal sense an "office of profit."

[Ed. Note.—For other definitions, see Words and Phrases, Office of Profit.]

**14. States** ⊛⟶52—**Commissioner of Conservation held not shown to have been guilty of gross incompetency resulting in great loss through theft of muskrat pelts, or to have entered into illegal fur-trapping contract, warranting removal (Const. art. 9, § 6).**

In proceeding under Const. art. 9, § 6, for removal of Commissioner of Conservation from office, evidence *held* not to sustain charges of gross incompetency resulting in great losses through theft of muskrat pelts nor of alleged illegality of fur-trapping contract, which defendant entered into under advice of Attorney General.

**15. States** ⊛⟶52—**Judgment debarring Commissioner of Conservation from holding any office in state after conviction is erroneous, as only impeached officers are subject to such penalty (Const. art. 9, §§ 1, 2, 6).**

In suit in district court for removal of state or district officer under Const. art. 9, §§ 1, 6,

the only penalty is mere removal from office, it being only in cases of impeachment trials by Senate under article 9, §§ 1, 2, that impeached officer is subject to disbarment from holding office after conviction, and hence judgment in proceedings against Commissioner of Conservation debarring defendant from holding any office under the state was erroneous.

Appeal from Civil District Court, Parish of Orleans; M. M. Boatner, Judge.

Proceedings by Percy Saint, Attorney General, against Valentine K. Irion, Commissioner of Conservation, to remove the defendant from office. From a judgment of removal, defendant appeals. Judgment annulled, and reversed, and suit dismissed.

Edward Rightor, of New Orleans, Rene A. Viosca, of Hammond, and Liskow & Irion, of Lake Charles, for appellant.

Percy Saint, Atty. Gen., and Hugh M. Wilkinson, of New Orleans, for appellee.

LAND, J. On the 14th day of August, 1925, the late Governor Fuqua appointed the defendant, Dr. Valentine K. Irion, Commissioner of Conservation of the state, to fill an unexpired term of office.

On the 11th day of October, 1926, Governor Fuqua died and was succeeded by Lieutenant Governor O. H. Simpson.

The present suit was filed on November 23, 1926, by the Attorney General upon the written request of the Governor, who specified the charges to be preferred against the defendant as Commissioner of Conservation.

This proceeding is instituted under section 6 of article 9 of the Constitution of 1921, for the removal of defendant from office for some of the causes enumerated in section 1 of that article.

The petition of ouster contains 110 articles and 24 specific charges, all of which were dismissed by the trial judge with the exception of five charges, which were sustained. Under these charges defendant was forthwith removed from the office of Commissioner of Conservation, and debarred by the judgment of the lower court from ever holding office under the state of Louisiana. Defendant has appealed.

The charges upon which the judgment of dismissal is predicated are:

(1) Buying ducks.

(2) Having whisky on the department's boats.

(3) Entertaining defendant's friends on these boats.

(4) Charging personal auto expenses to the department.

(5) Carrying a "deadhead" on the pay rolls of the department.

We shall first consider and dispose of these charges.

### 1. Charge as to Buying Ducks.

[1] Defendant was tried in the district court of Jefferson parish early in February, 1927, on the above charge of buying ducks, and was acquitted by Judge Rivarde with the following comment:

"The court has listened very carefully throughout this case. At one time it appeared that it would be a big case, for it would have been a serious thing for the Commissioner of Conservation to violate the Conservation Law. There is no evidence put in that Dr. Irion ever bought any ducks. I don't see anything at all in this case. Somebody is trying to use this court to bolster up something else. They are trying to wash some linen here." Transcript, vol. III, p. 826.

On the trial of this case in the civil district court, Emile R. Senac, port captain in charge of maintenance of the conservation department fleet, and the state's chief duck witness, admitted, under cross-examination, that his testimony given in the district court of Jefferson parish before Judge Rivarde was the same as that given by this witness in the present case. To quote the exact language of the witness:

"Q. Did you or did you not testify there, as you have on the stand today, concerning the purchase of ducks?

"A. As near as I possibly could; yes, sir." Transcript, vol. II, bottom page 462, top page 463.

Harry Mason, a cook of the crew of the conservation boat Rainbow, who was under the immediate orders of Senac as port captain, is the other star witness for the state. He also appeared on behalf of the prosecution on the trial of defendant in the district court of Jefferson parish. Transcript, vol. II, bottom page 538, top page 539.

Defendant selected Earhardt, a conservation agent, to accompany him on the duck hunt, as defendant desired to make some inspections of trapping lands in that section.

It was Senac, however, who suggested that he would get Mason to go along and serve defendant on the trip as cook. Transcript, vol. V, p. 1549.

It was Mason, the man selected by Senac, who reported the purchase of ducks by the defendant to the attorney assisting in the prosecution of this case. It was Mason who made an affidavit as to this purchase. And it was Mason who appeared as a state's witness and general corroborator of Senac, the chief duck witness for the state, both in the trial in Judge Rivarde's court and in the trial in the civil district court for the parish of Orleans. Transcript, vol. II, p. 566.

The present ouster suit had been instituted about 30 days at the time of the duck hunt. The conviction of defendant in Judge Rivarde's court was a matter of most vital importance in order to bolster the pending suit for the removal of the defendant from office. In fact, it was of such moment that, notwithstanding the acquittal of defendant, the same charge has been preferred against him a second time, and by amended petition filed in this case.

After hearing the state witnesses, Senac and Mason, and the defendant and his witness, George Lucas, a young business man, Judge Rivarde, in discharging the defendant,

remarked with apparent condemnation of the prosecution:

"I don't see anything at all in this case. Somebody is trying to bolster up something else. They are trying to wash some linen here."

That Judge Rivarde did not accept Senac and Mason as credible witnesses is plainly shown by his comment on their testimony: "There is no evidence put in that Dr. Irion ever bought any ducks."

After a thorough review and consideration of the testimony in this case, we have reached the same conclusion.

The whole duck case, in a nutshell, is nothing more nor less than a deliberate attempt to distort a tip paid by defendant to some caretakers into a purchase by him of eight ducks, which were given to the hunting party by the caretakers.

The true testimony in the case shows that three caretakers on the Johness game preserve on Bayou Dupont in Jefferson parish had rendered some service to defendant and his party in extending to them, without a written and customary permit from Mr. Allen Johness, the courtesy and privilege of hunting on his private grounds. Defendant had been frequently invited to hunt there by Mr. Johness, but had failed to obtain from him the necessary permit. Transcript, vol. V, pp. 1550, 1551.

At the request of defendant, a tip of $6 was paid these caretakers by Senac, who defrayed all the expenses of the trip and who was reimbursed later by defendant and George Lucas, the guest of defendant on the hunt.

We fail to see any room for just criticism of defendant for the payment of this tip. Had the caretakers refused the party admission to the game preserve, the hunt would have been a failure and a keen disappointment to defendant and his guest, if not to the entire party. The caretakers had rendered to defendant a real service.

It is true that Senac and Mason testify that

the ducks were purchased outright upon the order of the defendant. This testimony, however, is flatly contradicted by defendant and Lucas, who, in our opinion, are trustworthy witnesses. Transcript, vol. V, pp. 1552, 1553; Tr. vol. III, pp. 718, 719.

It is incredible, ·upon its face, that defendant, within 30 days after an ouster suit had been filed against him, should publicly order a conservation employee to buy ducks, in open and flagrant violation of the conservation laws of the state, and thereby willfully· add a plain misdemeanor in office to the long dragnet of charges already preferred against him.

The witness Senac, in order to show his good will towards defendant and to prove his loyalty in guarding defendant's interests, testified that he suggested the use of his (Senac's) private boat, as a protection to defendant against criticism in the use of a department boat for a private hunting trip. Transcript, vol. II, pp. 451, 487.

Yet this same witness, while still an employee of the conservation department under defendant, accompanied Major Payne, the newly appointed Commissioner of Conservation, on the night of January 31, 1927, in his forcible entry and seizure of the office of defendant, who had been commissioned as head of the conservation department by the late Governor Fuqua. Transcript, vol. II, pp. 470, 471, 494.

If Senac expected nothing from Major Payne, recently selected commissioner, why was Senac found rallying under his banner on the occasion of this midnight raid?

This same witness, within a week afterwards, also appeared in Judge Rivarde's court as the main actor in the duck extravaganza, and strenuously endeavored by his testimony to convict and to drive his chief from office, and to place upon him and his family the lasting stigma of disgrace as a discredited and expelled public official.

· The animus and feeling of the state witness Harry Mason against defendant is also apparent.

He was asked on the witness stand if he also had accompanied Major Payne, when he invaded with force and arms the conservation office of defendant. The witness replied that he had not, *but would have done so if he had been asked.* Transcript, vol. II, p. 567.

At the time of this trial, both of these witnesses had been dismissed from service as employees of the conservation department.

A short while after Mason's dismissal by defendant, we find this witness nestled in a new position in the New Orleans office of supervisor of public accounts. A newspaper reporter called at the office and published a story about Mason's working there. As a result of this story Mason was let out, under the excuse that his employer "was not ready to put on any extra help." Transcript, vol. II, pp. 569, 570, 571.

We are not favorably impressed with the testimony of either Senac or Mason, witnesses for the state. In order that testimony may serve as a safe basis for judicial action, it must be entirely free from prejudice, design, and self-interest, especially in cases in which the state seeks to remove a public officer.

All of the facts and circumstances considered, we are far from convinced that defendant bought any ducks for himself, or for his guest, as charged in the petition for removal, and as sworn to by these two witnesses.

As to the nature of the evidence required in cases of removal from office, the late Chief Justice Monroe, in State v. Marrero, 132 La. 147, 148, 61 So. 149, Ann. Cas. 1914C, 783, stated the rule as follows:

"Where some of the members of the community become dissatisfied with the results accomplished by a particular officer, they may, if sufficiently numerous, choose another, in his place, at the time and in the manner provided

by law, merely to make room for an officer whom they think, or hope may do better; but, when they undertake to remove such officer, by a method which carries with it, as a penalty, the fixing upon him of a stigma which he is to bear throughout his life, and which his children are to feel after his death, it becomes necessary to establish, with at least reasonable certainty, if not beyond reasonable doubt, the faults, of commission or omission, which, under the law, call for such penalty."

2. Having Whisky on the Department's Boats.

It is provided in section 1 of article 9 of the Constitution of this state that:

"All state and district officers, whether elected or appointed, shall be liable to impeachment for high crimes and misdemeanors *in office*, incompetency, corruption, favoritism, extortion, or oppression *in office*, or for gross misconduct, or *habitual drunkenness*." (Italics ours.)

Section 6 of article 9 declares that:

"For any of the causes enumerated in section 1 hereof, any officer, whether state, district, parochial, or of a ward or municipality, except the Governor, Lieutenant Governor, and judges of the courts of record, may be removed by judgment of the district court of his domicile. The Attorney General or district attorney may, in his discretion, institute such suit, and shall do so (except when the suit is to be brought against himself) on the written request, specifying the charges, of twenty-five citizens and taxpayers, or of the Governor, in the case of state, district, parochial or municipal officers, and of ten resident citizens and taxpayers in the case of ward officers."

[2] The Commissioner of Conservation is an officer of the executive department of the state government, and is appointed by the Governor. Const. 1921, art. 5, §§ 1 and 18.

He is a state officer, and is subject therefore to removal from office for any of the causes enumerated in section 1 of article 9 of the present Constitution.

The Eighteenth Amendment to the Constitution of the United States had been ratified, and the Volstead Act, prohibiting the possession or transportation of intoxicating liquor, had been enacted, prior to the adoption of our state Constitution in the year 1921. The framers of this Constitution were well aware, at the time, of the existing federal legislation on this subject. Had they intended to deal with the liquor question as a cause of removal from office, except in the solitary instance of "habitual drunkenness," unquestionably they would have so declared in our organic law in express terms.

The exclusion of any other intention is also shown from the use, in section 1 of article 9 of the present Constitution, of the restricted term "*habitual drunkenness*," which, in legal definition, goes far beyond the taking of an occasional drink, or the possessing or the transporting of intoxicating liquor for beverage purposes or for sale.

[3] The term "habitual drunkenness," or "habitual intemperance," has a well-defined legal meaning. In Mack v. Handy, 39 La. Ann. 497, 2 So. 183, the court said:

"The phrase 'habitual intemperance' scarcely requires an interpretation; it is easily understood. It means the custom or habit of getting drunk. The constant indulgence in such stimulants as wine, brandy and whisky, whereby intoxication is produced. Not the ordinary use, but the habitual abuse of them. The habit should be actual and confirmed."

See, also, De Lesdernier v. De Lesdernier, 45 La. Ann. 1364, 14 So. 191; Schaub v. Schaub, 117 La. 727, 42 So. 249.

It is manifest that ordinary drinking, short of intoxication, furnishes no ground for the charge of "habitual drunkenness" or "habitual intemperance." Necessarily, the mere possession or transportation of intoxicating liquor for beverage purposes falls far short of such a charge.

[4] The defendant is not prosecuted in the present case for the violation of Act 39 of 1921, known as the "Hood Law." This is not a criminal but a civil proceeding, in which the state seeks to remove defendant from office on certain specified charges.

As declared in article 6, § 1, of the Constitution of 1921, the Commissioner of Conser-

vation "shall have and exercise such authority and power as may be prescribed by law."

Defendant is charged by various statutes with the special official duty of protecting and conserving the natural resources and the wild life of the state, but not with the enforcement of its prohibition or liquor laws. Act 91 of 1922; Act 252 of 1924; Act 123 of 1926; Act 273 of 1926, etc.

In Coco v. Jones, 154 La. 124, 97 So. 337, we had occasion to construe the terms "high crimes and misdemeanors in office" and "gross misconduct," used in section 1 of article 9 of the Constitution of 1921 as causes for which certain public officers may be removed. The conclusion reached in that case was that a public officer was not subject to removal from office for any high crime or misdemeanor, or for any gross misconduct, unless committed in connection with his official acts. In other words, the accusation must pertain to official and not to private conduct. The act, to afford cause for removal, must be committed in an official and not in a private capacity. State v. Kellam, 4 La. 495; State ex rel. Moore, District Attorney, v. Reid, Sheriff, 129 La. 158, 55 So. 748, Ann. Cas. 1912D, 1081; State ex rel. Attorney General v. Cheevers, 32 La. Ann. 941.

[5, 6] It appears from the evidence that in the month of July, 1926, defendant had in his possession the remnants of a pint bottle of prescription whisky aboard the "Rainbow," a conservation boat, and, while at Jonesville, La., divided the last of the small contents among the members of the crew of the vessel. Transcript, vol. VI, pp. 1745–1747.

It appears also that some of the guests on the conservation boats brought their whisky with them, or secured it from the shore during the trip on more than one occasion. The presence of liquor on board was known to defendant. There was no drunkenness on any of these trips, as far as the evidence shows.

While it is much the better course for a public officer to obey the laws of his state, whether affecting his official duty or not, yet this court is powerless to remove from office any incumbent for a cause not prescribed by the Constitution of the state.

When a public officer violates, in his private capacity, a statute which does not pertain to his official duty, the only legal remedy is prosecution, conviction, and punishment in the criminal courts.

Until the people of this state see fit to change the law, it is the sworn and solemn duty of this court to follow it in removal cases, regardless of the personal views of any of its members on the prohibition question.

Conviction for violation of the prohibition law is not such conviction of crime as involves moral turpitude. Bartos v. U. S. (C. C. A.) 19 F.(2d) 722; Coykendall v. Skrmetta, No. 5018, 22 F.(2d) 120 (Fifth C. C. A. October 22, 1927); People v. Leslie, 239 Mich. 334, 214 N. W. 128.

In Coco v. Jones, 154 La. 134, 97 So. 337, the court said:

"With regard to 'misdemeanors in office,' it was perhaps deemed unwise, in the light of the modern tendency to legislate against all kinds of indiscretions, to make any or every misdemeanor on the part of a public official—even a misdemeanor *having nothing to do with his official duties or his moral character*—a cause for impeaching him or removing him from office." (Italics ours.)

"Gross misconduct" means "official misconduct, or habitual vice." Coco v. Jones, 154 La. 134, 97 So. 337; Attorney General v. Cheevers, 32 La. Ann. 941, 946.

Defendant, in our opinion, is guilty of neither, under the particular specification charged against him.

### 3. Entertaining Defendant's Friends on Department Boats.

[7] It appears from the evidence that defendant invited his friends to join him on

some boat trips that were not of an official character. It is not denied that members of the family of defendant, on several occasions, have used conservation boats for outings.

There is no law of this state prohibiting the use of the boats of the conservation fleet for either purpose. The office of Commissioner of Conservation being appointive, such matters are controlled largely by the policy of each state administration. All testimony, however, as to custom in such cases, was excluded on the trial, on objection to its admissibility by the state.

While defendant was at fault in charging the expense of these boat trips to the conservation department, it was not, in our opinion, such gross fault or grave misconduct as to amount to moral turpitude, and to require his dismissal from office. We so hold for the reason that there was nothing found in the court below, in the administration of the finances of the department of conservation, to show either wasteful extravagance, as charged, or dishonesty or misappropriation by defendant, although the funds administered by him consisted of thousands of dollars annually.

Defendant having run the gauntlet of a multiplicity of charges of the gravest character in the lower court, and having been acquitted of them, cannot be justly condemned on matters comparatively trivial, nor can he be justly regarded as a public officer whose reputation has been impaired by the graver charges, which have been dismissed. A faultless administration of a large executive office is not possible, as public officers are not angels, but merely men of flesh with human frailties.

4. Charging Personal Auto Expenses to the Department of Conservation.

[8] The specification that defendant was guilty of petty grafting in charging to the conservation department $10 per month for the rent of a garage on his premises is shown by the evidence to be without any foundation in fact.

Instead of this garage being the property of defendant, it had been erected in defendant's back yard by his son at an expense of $1,000. As a matter of convenience in the use of his official car, one compartment of this garage was rented by defendant from his son at $10 per month, which was the amount of the monthly rental allowed to defendant by the conservation department for garage hire.

Defendant's son permitted his mother to use the other compartment of this garage for her Ford car, and rented a garage in the neighborhood for his car with the rental received from his father. Under the facts of the case, defendant was not guilty of any wrongful act. Transcript, vol. IV, pp. 966, 977; vol. VI, pp. 1526, 1527, 1528.

The charge also that certain gasoline tickets signed and approved by defendant's wife and son were for their personal use, but had been charged to the conservation department, is not sustained by the evidence in the case.

It is shown that this gasoline was used in defendant's official car and was obtained for that purpose with his knowledge and consent. Transcript, vol. IV, pp. 967, 982, 983, 984, 985, 986; vol. VI, pp. 1528, 1529.

An attempt was made to prove that on one occasion when gasoline was purchased, May 10, 1926, defendant was not in the city of New Orleans, but was in attendance on the state Legislature in Baton Rouge. The Legislature convened on Monday, May 10, 1926, but the testimony of defendant shows that he did not arrive at the state capitol until Thursday of that week. Transcript, vol. VI, p. 1584; vol. IV, pp. 984, 987.

It also appears from the evidence that some inner tubes that would not fit the Lincoln car used by defendant as commissioner, but would fit a Buick or Ford car, had been charged to the conservation department.

Defendant had a Buick car also for his official use. When this car was in shop undergoing repairs, defendant would use his wife's Ford, which was in the garage on his premises, for conservation trips. If any accident happened to his wife's car, in the way of punctures or otherwise, defendant would have the car repaired and returned to her in the same condition in which he had received it. There were some tubes damaged by defendant while he used his wife's car in his conservation work, and these were replaced. This expense, in our opinion, was a proper charge against the department, and not by any means an act of petty grafting. Transcript, vol. V, pp. 1529, 1530, 1531.

There was no concealment as to these charges for garage rent, gasoline, and auto supplies. These items appear on regular vouchers of the conservation department and were filed in its archives. The state offered no evidence except the vouchers themselves. The testimony of defendant, corroborated by that of his son, is not contradicted by a single witness. The state has clearly failed to prove the charges in question with that degree of certainty required by law. State v. Marrero, 132 La. 109, 61 So. 136, Ann. Cas. 1914C, 783.

5. Carrying Frank T. Martin as a Deadhead on the Pay Roll of the Department.

[9] Defendant is charged with fraudulently carrying "as deadheads" on the pay roll of the conservation department the name of Frank T. Martin for the months of June and July, 1926, and the name of Dr. G. W. Martin for the month of August, 1926. To each of them it is alleged that salaries were paid by defendant during this period for services not rendered, in violation of section 2 of Act 57 of 1888.

Defendant, however, was convicted in the lower court only in the case of Frank T. Martin, who was appointed conservation agent as early as October 1, 1925.

On June 9, 1926, Frank T. Martin was sentenced to the Caddo parish jail for a term of 90 days, under a plea of guilty in the federal court to cutting and selling timber from a United States homestead entry, and was released, under suspension of sentence, on August 21, 1926. While he was in prison, Frank T. Martin's wife was paid $100 per month, the amount of his former salary, under an agreement made between defendant and Dr. G. W. Martin, the father of the young man.

The uncontradicted testimony in the case is to the effect that Dr. Martin, shortly after his son's sentence, paid a visit in June, 1926, to Baton Rouge, where defendant was engaged at the time in legislative matters, and prevailed upon defendant to pay to the wife and children of Frank T. Martin his former salary. while he was in prison, with the express understanding that the doctor should perform the duties of his son as conservation agent during the entire term of his imprisonment. Defendant instructed Dr. Martin, at the time, to take up and continue his son's work during the rest of the month of June, and promised him on July 1, 1926, a commission as conservation agent under which to operate thereafter.

There is no doubt in our minds as to the good faith of defendant in entering into this agreement, or as to the legality of the same under the jurisprudence of this court.

In State v. Farrell, 130 La. 228, 57 So. 898, it is held that:

"There is a difference between receiving *salary* for services 'not actually rendered,' and receiving *pay* for services 'not actually performed' by the one by whom the salary is collected. The former is within the intendment of the act; the latter is not." Act 155 of 1888. (Italics ours.)

It is stated in the syllabus of the Farrell Case that:

"Where one appears on the pay rolls of the city of New Orleans and receives pay for services rendered the city by another, acting on his behalf, he does not violate Act 155 of 1888,

which provides 'that any person who shall knowingly permit his name to be carried on the pay rolls of any state, parish, municipal or other political corporation, as employee, *and receive salary, or pay for the services not actually rendered'* shall be guilty of a crime, as the services have been 'actually rendered,' and the act is violated only when the services are 'not actually rendered.' "

Section 2 of Act 57 of 1888, relied upon by complainant in this case, prohibits a public officer from carrying *"fraudulently"* a "deadhead or pretended employee" on a pay roll for *"salaries or pay for services not rendered."*

The same interpretation must be placed upon the italicised provisions of each of these acts, as they are similar in language. Under the construction placed upon these particular clauses by the Farrell Case, if Dr. Martin performed the services as conservation agent for his son during the months of June, July, and August, 1926, then Frank T. Martin had the legal right to accept the pay for each of these months, since the state is not concerned as to the particular person who may receive the pay, if the services are actually rendered, and as Dr. Martin may do what he pleases with the salary earned by him. Under such circumstances, no fraud could be perpetrated upon the public fisc by allowing the pay for services rendered by Dr. Martin to go to Frank T. Martin, whether he was in or out of jail. As the agreemen entered into between defendant and Dr. Martin was legal and made in good faith by defendant, there was no fraudulent intent upon his part to place a "deadhead" on the pay rolls of the department, and, without such unlawful intent, it is clear that defendant cannot be convicted under Act 57 of 1888.

The evidence convinces us that Dr. Martin was a bona fide conservation agent, and not a "deadhead." Even at the date his testimony was given in the case, April 12, 1927, the doctor still held his original commission, issued to him by defendant on July 1, 1926, and was still serving the department as conservation agent.

The testimony of the state witnesses to the effect that Dr. Martin performed no services as conservation agent during the months of June, July, and August, 1926, is purely of a negative character, and is the weakest kind of evidence. These witnesses state that they reside in Arnaudville, St. Landry parish, where Dr. Martin also lives, and that they did not know that he had a commission as conservation agent, and had never seen him discharging his duties as such. It is hardly to be expected that the doctor would perform such duties on the streets or in the alleys of Arnaudville. Not one of these witnesses pretends to have watched or followed Dr. Martin on a single trip made by him outside of the town limits. Such evidence, at best, is the mere opinion of each of these witnesses.

On the other hand, the testimony of Dr. Martin is in the record, detailing his activities as conservation agent, and the official reports to the department of conservation of work done by him were tendered on the trial of the case. It was also known to some of the citizens of Arnaudville that the doctor was conservation agent. Judge de Kerlegand saw his commission in July, 1926, and testified that it was of date July 1, 1926.

Dan Martin, conservation agent of the adjoining parish of St. Martin, who also lived in Arnaudville, knew that the doctor was commissioned in July, 1926. This witness testified that, during the month of June, 1926, at the request of the doctor, he had arrested four parties for killing deer out of season in St. Landry parish, and that all of them had pleaded guilty in court. Dan Martin testified, also, that he had assisted the doctor in making out his first reports to the department as conservation agent.

It is true that Dr. Martin had a good

country practice; but he testified that his whole time was not taken up by his patients, and it appears, moreover, that the position he held with the department was only a part-time job, paying a salary of $75 per month, with an extra $25 for expenses.

The entire salaries earned by the doctor during the months of June, July, and August, 1926, were paid to the wife of his son, Frank T. Martin. Two of the checks for June and July, 1926, were made payable to Frank T. Martin, but the full amount of each was received by his wife. As a matter of law, under the decision in the Farrell Case, Frank T. Martin had the legal right to receive, directly and for his own account, the face value of each of these checks, had he so desired. The August check was made payable to Dr. G. W. Martin, and its proceeds in full were delivered by him to his daughter-in-law.

The state has failed to prove this charge, and it must be dismissed.

Administration of Finances of Department.

[10, 11] The department of conservation consists of eight divisions: Finances; enforcement; forestry; fisheries; wild life; oysters; minerals; and fur.

Citizens of the state of high standing testified that defendant's administration of the divisions of enforcement, forestry, oysters, and minerals was better than that of his predecessors, and the judge of the lower court found that his administration of the division of finances was satisfactory.

The divisions of fisheries and wild life are eliminated from consideration, as no evidence was offered as to them. While the fur division was under attack, the state failed signally to prove its case, and the charges of complainant as to that division were dismissed.

The department of conservation, like a vast department store, cannot be managed efficiently without the expenditure of large sums of money. Realizing this fact, the Legislature, after appropriating the sum of $175,000 for the operating expenses of the department for the fiscal year ending June 30, 1926, found it necessary, in order to meet a threatened deficit in May and June of that year, to authorize a loan of $50,000 to the department. That this additional sum was needed also thereafter for the future operations of the department is shown by the fact that the Legislature increased its appropriation for the following fiscal year to $225,000.

The Legislature of the state is necessarily the best judge as to the financial needs of the various state departments and boards.

It is true that a further deficit occurred later on, but that was due entirely to the unwarranted transfer by the state authorities to the general state fund of sand and gravel royalties, which for more than 12 years previously had been collected by the department, and which constituted a part of the revenues to which the department was legally and justly entitled. These royalties were restored to their rightful place in the general conservation fund by the judgment of this court in the case of Irion v. Lyons, 164 La. 306, 113 So. 857, and this deficit would not have taken place had these royalties been available at the time as they should have been. Nor would defendant have been compelled, as he was, to assess against the funds of the forestry, minerals, and fur divisions a proportion of the expenses of the auditing and enforcement divisions, which theretofore had been paid wholly out of the general conservation fund.

The state cannot be permitted to withhold with one hand the lawful revenues of the department and then to smite defendant with the other hand because a deficit resulted from such unwarranted withholding.

It is clear to our minds that the deficits

complained of were due solely to lack of sufficient funds for operating expenses, and not to improvident and reckless waste or to gross incompetency, as charged against defendant.

In this connection, we will consider also the charges of extravagant expenditures in the alleged employment by defendant of conservation agents for political purposes, and in the purchases of conservation boats, of an automobile for department use, and of a victrola for $50.

As long as the appointment of such agents is left to the judgment and discretion of the Commissioner of Conservation, the courts have nothing to do with the matter, unless it is shown that the appointees did not render useful services for the money paid them. No such showing is made in the case by complainant.

As to the political views and activities of conservation agents, the courts are not in the least concerned, as there is no law of this state forbidding employees of administrative boards to engage in partisan politics equally with the rest of the general electorate.

The purchase of boats, automobiles, etc., is purely an administrative affair left also to the judgment and discretion of defendant as Commissioner of Conservation. This court has repeatedly held that it would not undertake to control the discretion of a public officer or board, unless arbitrarily or fraudulently exercised. There is no proof of fraud, bad faith, or improper motives upon the part of defendant in these various transactions, and we decline, therefore, to substitute our discretion for that of the commissioner in making these purchases. Chiro v. Fourth Jefferson Drain. Dist., 159 La. 471, 105 So. 556.

### Carbon Black Legislation of 1926.

[12] An attempt has been made in this case to convict and remove defendant from

165 LA.—34

office on account of his connection with proposed carbon black legislation at the session of the General Assembly in the year 1926.

While this particular charge is not made one of the grounds of removal of defendant, it is made the basis in the judgment of the lower court for criticism of defendant's capacity and firmness of character, and evidently was held against him as one of the causes influencing the trial judge in his final action in the matter.

The defendant cannot be singled out as the target for attack in this case because of the failure of carbon black legislation in the year 1926, for the simple reason that the present Constitution in mandatory terms declares that:

*"The Legislature shall enact all laws necessary to protect, conserve and replenish the natural resources of the state, and to prohibit and prevent the waste or any wasteful use thereof."* Const. 1921, art. 6, § 1.

Our organic law has placed *upon the Legislature,* and not upon the Commissioner of Conservation, the sole duty and the sole responsibility in the matter of the enactment of all necessary conservation laws of the state. This would be equally the case whether defendant favored or opposed the carbon black bill in 1926. At all times the Legislature must exercise its own independent judgment and discretion in such matters, and legal accountability for legislation of this kind cannot be shifted from "the powers that be" and saddled upon irresponsible shoulders, but such accountability must rest and remain where the fundamental law of this state has solemnly placed it.

The uncontradicted testimony in the case is that the carbon black bill of 1926, after being opposed by Senator Hood, and advocated by the Attorney General in the Senate committee was reported unfavorably by the unanimous vote of the committee. Senator Hardtner, one of the most prominent and in-

fluential members of that committee, declared as a witness in this case that, without defendant's participation in the matter, a majority of the Senate committee and of the Legislature would have been against the measure, as, in his opinion, it was unwise and unnecessary.

The whole atmosphere of the case indicates that the carbon black bill of 1926 was slated for slaughter by the opposition, and failed to become a law because of the attitude of the Legislature against its passage. As the legislative department of government is alone responsible, under the Constitution, for the policy of the state in so far as it affects the carbon black industry, defendant cannot be held legally accountable therefor, and cannot be removed from office whether he favors or opposes proposed legislation upon this subject.

### Dual Office Holding.

[13] It is charged that defendant is guilty of gross misconduct, in that he holds and exercises at the same time more than one office of profit under the state, in violation of section 4 of article 19 of the Constitution of 1921. The offices specified as held by defendant are Commissioner of Conservation and secretary of the state dental board. As defendant has resigned the latter position, the charge is without any foundation upon which to rest. Transcript, vol. III, pp. 616, 617.

Moreover, the secretary of the state dental board is a mere clerk of the board. He is selected by the board and receives no salary. His sole compensation consists of commissions on fees. In no proper legal sense is such clerk the holder of an office of profit under section 4 of article 19 of the present Constitution. Transcript, vol. V, p. 1538.

### "Palm-to-Pine Tour."

Defendant is charged with favoritism and gross misconduct in permitting Stanley C. Arthur, the director of wild life, to take an automobile trip with his wife to Canada at the expense of the department. The trial judge found that the trip was for a useful and important public purpose, the promotion of friendly relations with our Canadian neighbors, and dismissed the charge. We find no error in the conclusion reached by him.

### Fur-Trapping Operations on State Game Preserves.

[14] Charges of gross incompetency are preferred against defendant in connection with fur-trapping operations on Marsh Island, during the latter part of 1925 and in the early part of 1926. It is alleged that by his mismanagement great loss resulted to the state through thefts of 100,000 muskrat pelts, through decrease in production from 184,000 to 49,000 skins, and through the operating expenses of the department.

A fur-trapping contract for the season 1926-1927 was also entered into by defendant with one Morris Steinberg, under which payment of $12,500 was made the department on October 2, 1925, and payment of a similar sum on November 5, 1925.

This contract is attacked as illegal because in alleged violation of the law prohibiting a state department from borrowing money except through prescribed channels, and also because in alleged violation of the rule requiring the disposal of resources owned by the state at the market value, and to the highest bidder.

A complete answer to the attacks made on the Steinberg contract is that defendant acted in the matter under the advice of the Attorney General, who is the legal adviser of the department of conservation of the state. Defendant is therefore fully protected by his good faith in entering into this contract.

The evidence satisfies us, as it did the lower court, that defendant is not guilty of any substantial faults in the management of trapping operations on Marsh Island, that the

conservation agents in charge did all that could be reasonably expected to safeguard against fur thefts, and that, owing to the size, character, and location of Marsh Island, complete policing of the same was impracticable, except at a cost not justified by results.

The theft of furs proven on the trial is negligible when compared with the 100,000 pelts, which were charged to have been purloined through the gross incompetency and flagrant mismanagement of the defendant. The state has failed thoroughly to establish this charge.

#### Deadheads on Department Pay Rolls.

It is charged that defendant, in violation of section 2 of Act 57 of 1888, fraudulently carried upon the pay roll of the department for the months of July, August, September, and October, 1926, the name of George Holzhauser, who is alleged to have been paid salaries for these months for services not rendered. This charge is disposed of by the trial judge in the following language:

"The charge against the defendant that he paid salary to one Holzhauser for services not performed depends for its proof largely on the testimony of Holzhauser. This man's denial of his own signature, the obvious falsity of his testimony in other respects, and his demeanor on the stand discredit him completely; and the case on this point fails."

We deem further comment as to this charge unnecessary.

[15] The judgment of the lower court is erroneous also in that it debars defendant from holding any office under the state.

The Constitution of 1921 has made a clear distinction in this respect between a judgment of conviction pronounced by the state Senate in case of impeachment of a state or a district officer, and a judgment rendered by the district court of the domicile of such officer in a proceeding for his removal from office.

In cases of impeachment trials by the state Senate, it is expressly provided that:

"Judgment of conviction in such cases *shall remove and debar* the accused from holding any office under the state," etc. Const. 1921, art. 9, §§ 1 and 2.

But in suits in the district courts of the state for the removal of a state or a district officer, it is only provided that such officer "may be removed by judgment of the district court of his domicile." Const. 1921, art. 9, §§ 1 and 6.

It is plain therefore that, under our present organic law, only an impeached officer is subject to debarment from holding office after his conviction. An officer removed by the judgment of a district court cannot be so debarred, the penalty in such case being restricted merely to his removal from office.

For the reasons assigned, it is ordered that the judgment appealed from be annulled and reversed.

It is now ordered that all of the charges preferred herein by the plaintiff, the Attorney General, against the defendant, Dr. Valentine K. Irion, be dismissed, that plaintiff's demand for the removal of defendant from the office of Commissioner of Conservation of the state be rejected, and that plaintiff's suit be dismissed.

O'NIELL, C. J. (concurring in the decree). I prefer to state my own reasons for concurring in the decree in this case, because I do not subscribe to all that is said in the majority opinion.

It is conceded in the brief filed on behalf of the state that the questions presented for decision are mainly, if not entirely, questions of fact. There is little or no dispute about the propositions of law advanced by the Attorney General. It is conceded also that the findings of fact by the judge who first tried the case, and who saw and heard the witnesses, is entitled to great weight in the appellate court, where the judges do not see or hear the witnesses testify, and have to depend upon a reading of the transcript of the testimony, as taken down stenographical-

ly. There were 24 specific charges made against the defendant in this case. The trial judge acquitted him of 19—which were the most serious—of the 24 charges. The judge's findings of fact on the 19 most serious charges have been verified and confirmed by the two Justices of this court who have read the voluminous record of the testimony. I accept those findings of fact as being correct. The Constitution (article 7, § 6) requires only two Justices of the Supreme Court to read the transcript or record in each case. Nearly six weeks were spent in the trial of this case in the court below; and there are nearly 2,000 typewritten pages, or 600,000 words, of testimony in the record. If the Constitution required the seven members of this court to read all such records the court could not function. I was not one of the two Justices to whom was assigned the task of reading the record of the testimony in this case. Having heard the arguments and read the briefs of the learned counsel on both sides, I accept as correct the facts found by the two members of the court who read the testimony. The five charges on which the defendant was found guilty by the trial judge were: (1) Buying wild ducks in violation of the game law; (2) having whisky for beverage purposes on the conservation boat Rainbow; (3) entertaining friends on the conservation boats and allowing the boats to be used for pleasure parties; (4) charging personal automobile expenses to the department of conservation; and (5) carrying deadheads on the pay rolls of the conservation department. The two Justices of this court who read the testimony came to the conclusion that the evidence did not sustain the accusation that the defendant bought wild ducks, in violation of the law which he was specially charged to administer, or the accusation that he charged personal automobile expenses to the department of conservation, or the accusation that he carried deadheads on the pay rolls. I accept those findings of fact as correct. As to the accusation of having whisky on the "Rainbow" for beverage purposes, the two Justices who read the record found that the offense consisted merely of having the remnant of a pint flask of prescription whisky on the boat. I concur in the opinion of the other members of the court that that indiscretion, if it was an indiscretion, was not such a grave offense as would justify the severe penalty of expulsion from office. I concur also in the opinion of the other members of the court that the entertaining of friends on the conservation boats, and allowing the boats to be used for pleasure parties, although perhaps it was overdone in some measure, was not such a flagrant abuse of the state's property as would justify our removing the defendant from office. For these reasons, I concur in the decree rendered in this case.

ST. PAUL, J. (concurring). In my opinion the only ground worthy of serious consideration as cause for defendant's removal from office is one which charges (in substance) that he purchased with public funds an "unnecessary" high-speed yacht, ostensibly for public purposes, but in reality only for his own pleasure and in order to favor a female "friend" and enable her to profit financially by the transaction. And that charge is wholly unfounded on fact. I therefore concur in the opinion and decree.