241 So.2d 469

In re Judge Edward A. HAGGERTY, Jr.

No. 50667.

Nov. 23, 1970.

Rehearing Denied Dec. 14, 1970.

2

Robert E. LeCorgne, Jr., New Orleans, Chief Executive Officer, for The Judiciary Commission of Louisiana.

Robert J. Zibilich, George E. Mouledoux, New Orleans, for defendant-respondent.

AYRES, Justice ad hoc.

This action is before this court on the recommendation of The Judiciary Commission of Louisiana that the respondent, Judge Edward A. Haggerty, Jr., of the Criminal District Court for the Parish of Orleans, be removed from office pursuant to charges directed against him under the provisions of Art. IX, Sec. 4, Par. B of the Louisiana Constitution as amended by Act No. 661 of 1968, which declare:

"A justice or judge may be removed from office or retired involuntarily for wilful misconduct relating to his official duty or wilful and persistent failure to perform his duty, or for habitual intemperance, or for conviction, while in office, of a felony.

I. THE JUDICIAL OBLIGATION.

The assumption of the office of judge casts upon the incumbent duties in respect to his personal conduct which concern his relation to the state and its inhabitants, the litigants before him, the principle of law, the practitioners of law in his court, and the witnesses, jurors and attendants who aid him in the administration of its functions.

"A justice or judge may be retired involuntarily for disability that seriously interferes with the performance of his duties and that is, or is likely to become, of a permanent character."

After a preliminary investigation, the Judiciary Commission concluded that a hearing should be had upon the proposition of the removal of the respondent from office for the reasons and on the grounds of willful misconduct relating to his official duties, willful and persistent failure to perform his duties, and habitual intemperance, as well as disabilities seriously interfering with the performance of his duties. After a six-day hearing, the Commission resolved from the evidence that the respondent was guilty of charges warranting his removal from office.

The charges with which we are now primarily concerned include, among others, the following:

Willful misconduct relating to official duties, namely, gross and persistent violation of Canons I[1], IV[2], VI[3], and

In every particular his conduct should be above reproach. He should be conscientious, studious, thorough, courteous, patient, punctual, just, impartial, fearless of public clamor, regardless of public praise, and indifferent to private political or partisan influences; he should administer justice according to law, and deal with his appointments as a public trust; he

XVII[4] of the Canons of Judicial Ethics, adopted by the Supreme Court of Louisiana on October 13, 1960, as follows:

1. In participating and assisting in the organization of an assemblage for indecent purposes at the DeVille Motel in the City of New Orleans on December 17, 1969;

2. In obtaining and assisting in obtaining certain lewd and obscene motion picture films for showing at the assemblage;

3. In participating with others in the assemblage and in the showing and exhibiting of certain lewd and obscene motion pictures and still photographs.

4. In contributing financially toward the cost of the assemblage;

5. In arranging for, or assisting in the arranging of, the attendance of three prostitutes at the assemblage;

6. In promoting or assisting to promote the three prostitutes to perform certain lewd and indecent acts, as well as acts of prostitution, at the assemblage;

7. In exhibiting personal conduct and behavior unbecoming a member of the judiciary at the time of the appearance of the officers of the New Orleans Police Department at the DeVille Motel and in striking the police officers, on the aforesaid date;

8. In participating in and condoning the participation of others in acts which violate the criminal laws of the State of Louisiana relating to obscenity and prostitution, on that date;

should not allow other affairs or his private interests to interfere with the prompt and proper performance of his judicial duties, nor should he administer the office for the purpose of advancing his personal ambitions or increasing his popularity. As a necessary corollary, the judge must be protected in the exercise of his judicial independence.

2. IV. AVOIDANCE OF IMPROPRIETY.

A judge's official conduct should be free from impropriety and the appearance of impropriety and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach.

3. VI. ESSENTIAL CONDUCT.

A judge should be industrious, temperate, attentive, patient, impartial, and, since he is to administer the law and apply it to the facts, he should be studious of the principles of the law and diligent in endeavoring to ascertain the facts.

A judge should be prompt in the performance of his judicial duties. He should recognize that the time of litigants, jurors and attorneys is of value and that habitual lack of punctuality or diligence creates dissatisfaction with the administration of the Court.

A judge should be considerate of jurors, witnesses and others in attendance upon the Court.

4. XVII. PERSONAL INVESTMENTS AND RELATIONS.

A judge should refrain, as far as is reasonably possible, from all relation which might affect him in the impartial performance of his judicial duties. He should refrain from all relationships which would prejudice or reasonably appear to prejudice his judgment.

A judge should not utilize information coming to him in his judicial capacity for his private advantage.

9. In associating with persons with known criminal records and reputations;

10. In participating in illegal gambling activities;

11. In conducting himself in such a manner as to bring disgrace and discredit upon the judicial office which he holds, resulting in a loss of public respect and confidence in his ability to perform his duties.

■ Respondent attacked the constitutionality of the Judiciary Commission and its proceedings and questioned the propriety or legality of the Commission's acts under the Fifth Amendment of the Constitution of the United States in taking his prehearing deposition and its calling him under cross-examination. Specifically, the question is, May any finding of facts be based upon his testimony? The gravamen of defendant's first contention is that the combination of investigative, prosecutive, and adjudicative powers in the Judiciary Commission offends due process. He contends there should be a separation of such functions. However, "It is well settled that a combination of investigative and judicial functions within an agency does not violate due process." Pangburn v. C. A. B., 311 F.2d 349, 356 (CA 1, 1962), citing and discussing many authorities. See, also: Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); 2 Davis, Administrative Law Treatise, Sec. 13.02 (1958).

In this regard, it may be well to point out that the power of the Commission is to investigate disciplinary cases within the judiciary and then, if cause be shown, to only recommend removal or involuntary retirement to the Supreme Court. La.Constitution, Art. IX, Sec. 4 (1968). The Commission itself is not a court. It can render no judgment, civil or criminal. See, e. g., Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838 (1929).

■ Under another provision of our state Constitution, the Civil Service Commission is authorized to investigate, as well as to hear and determine, charges in removal and disciplinary cases concerning classified employees. La.Constitution, Art. XIV, Sec. 15(O). The Louisiana courts have held that this combination of investigative and adjudicative functions does not violate due process. Vidrine v. State Parks and Recreation Commission, 169 So.2d 641 (La.App., 1st Cir. 1964), cert. denied 247 La. 348, 170 So.2d 867 (1965). We have not been cited nor does our own research reveal any authority supporting this contention of the respondent.

On the second of the questions above raised, the Commission, in conducting its investigation and subsequent hearing, assumed that the Fifth Amendment guarantees were available to the respondent in this disciplinary proceeding, although the authorities relied upon were the result of a

closely divided court. Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

■ Notwithstanding that these cases are somewhat distinguishable from the instant case, it was seemingly taken for granted by the Commission that the respondent might not be required to testify. In this instance, however, after the preliminary investigation was instituted, respondent voluntarily filed a statement with the Commission concerning his activities on the evening and night of December 17, 1969. He did not claim any privilege under the Fifth Amendment. The voluntary furnishing of his exculpatory version of the incident waives his privilege against testifying with regard to it since this statement was furnished as part of the removal proceedings. McCormick on Evidence, Secs. 130, 131 (1954); 8 Wigmore on Evidence, Sec. 2276 (3d ed., 1961); 98 C.J.S. Witnesses § 456; 58 Am.Jur. "Witnesses," Sec. 95 (1948 ed.). Subsequent statements were voluntarily filed by the respondent likewise waiving his privilege under the Fifth Amendment.

The cited law sources also reveal that a defendant in a criminal proceeding waives his Fifth Amendment privileges by voluntarily taking the witness stand, and that the privilege must be claimed personally by the witness entitled to it rather than by his attorney.

In the present proceedings, the respondent (in response to a subpoena) appeared for a prehearing discovery deposition on March 30, 1970. He then testified, voluntarily and without any personal claim to his privilege against self-incrimination. Preceding the taking of his testimony, respondent's counsel stated that "by appearing here, Judge Haggerty doesn't give up any of his rights under the United States Constitution * * * particularly the Fifth Amendment. * * *"

Likewise, at the hearing itself, respondent testified when called upon cross-examination as well as upon direct examination when called by his own counsel. In neither instance did he make any personal claim to his privilege, although his counsel did note that his testifying was subject to his constitutional rights which the respondent possessed against testifying adversely to himself.

■■ Aside from the waiver by the respondent by volunteering his statements after the Commission notified him of the preliminary investigation of causes for his removal or involuntary retirement, he likewise waived his right to refuse to testify by doing so voluntarily without any claim to his privilege under the Fifth Amendment. The privilege against self-incrimination is personal to the witness and may not

be claimed by anyone else, not even his own counsel. State v. Brown, 221 La. 394, 59 So.2d 431 (1952).

The Commission expressly noted, however, and we have likewise concluded that, even without respondent's own testimony, other testimony in the record clearly establishes each of the specifications of misconduct which we hold proved, as will be hereinafter shown. For instance, respondent's bringing the obscene films and the three prostitutes to the "stag" party are established by the undisputed testimony of other participants in the party. Other witnesses likewise established respondent's persistent, frequent, and public illegal betting with Victor Manuel Soto and their association together, as well as respondent's friendship with and indebtedness unto Frank Occhipinti, and respondent's regular and frequent engaging in poker games at which he won significant sums from, among others, members of the bar practicing before him. Without respondent's testimony, the testimony of others amply supports the Commission's factual findings of misconduct.

It appears appropriate to first determine the character of this action. The rule appears to be established that an action of this character, for the removal of a judge, like a proceeding for a disbarment, is not a criminal prosecution but is in the nature of a civil action. An observation of this court in State v. Flynn, 160 La. 483, 107 So. 314, 315 (1926), is to the effect that:

> "It is true, a few jurisdictions hold that proceedings of this character are of a quasi criminal nature, but the great weight of authority, including the Supreme Court of the United States, sustains the view that a proceeding to disbar an attorney is civil, not criminal, in its nature, and is governed by the rules applicable to civil actions; the purpose thereof being to purify the bar and not to punish the respondent. Thornton, Attys. at Law, § 867, vol. 1, p. 1282. See State [ex rel. Adams] v. Rightor, 22 So. 195, 49 La.Ann. [1015,] 1017."

See, also: In re Mundy, 180 La. 1079, 158 So. 563, 565–566 (1934); Saint v. Irion, 165 La. 1035, 116 So. 549, 553 (1928).

In Sharpe v. State ex rel. Oklahoma Bar Association, 448 P.2d 301 (Okl.Jud., 1968), a judge-removal proceeding, the court pointed out that such proceedings are not criminal prosecutions; that the jurisdiction of the court is limited to the removal with or without qualification or to the compulsory retirement of judges; that the court was charged with the duty of making rules of procedure consistent with the rules of civil procedure or common law, and that rules appropriate to criminal prosecutions were inapplicable.

█ Thus, simply stated, the Code of Criminal Procedure is not applicable be-

cause, by its terms, it applies solely to prosecutions for violations of criminal law.

It likewise appears appropriate, at this stage of the proceedings, to point out that the charges relating to the alleged violations of the Canons of Judicial Ethics, except insofar as they are also denounced in the language of the constitutional provisions hereinabove quoted and upon which this action is predicated, are not of primary importance. As stated in State ex rel. Gremillion v. O'Hara, 252 La. 540, 211 So. 2d 641, 648 (1968):

"Although the Canons of Judicial Ethics have great importance and meaning to members of the judiciary in setting the standard of conduct expected of members of the judiciary, they do not replace or modify the Constitution and the grounds for removal there stated."

Thus, the Canons of Judicial Ethics do not, of themselves, have the force and effect of law. Unless the specific charges based on the Canons are also acts prohibited by the constitutional provisions, they do not of themselves constitute grounds for the removal of a member of the judiciary from his office. However, as will be hereinafter shown, the specific charges to which attention will be directed clearly come within the terms of the aforesaid constitutional provisions as constituting willful misconduct relating to respondent's official duties.

Directed to the sufficiency of the charges directed to him, the respondent interposed various pleas and exceptions to which attention should next be given.

Respondent first urged *there be suppressed* as evidence all property seized at the DeVille Motel as well as all the visual observations made there by the police officers or others, and all testimony relating to such observations, and, in addition, all taped and recorded conversations or other evidence garnered as a result therefrom or from any observations made in or about the location, primarily for the reasons that the search and seizure were not incidental to a legal arrest of the respondent nor made under the authority of a search warrant; that no crime was being committed in the presence of the police officers, who were not armed with a warrant for an arrest, and that the search and seizure and respondent's arrest were effected without probable cause.

On a basis of and through *the motion to suppress,* respondent also objected to the admission of certain evidence on the ground that it was a product of illegal search and seizure and of illegal arrest. Evidence objected to included any testimony of the events of the "stag" party of December 17, 1969, as overheard through a radio-bugging device hidden from view in the clothing of a police informer, Brewer Pence. This testimony, it was contended,.

formed no basis for the arrest without a warrant since it did not furnish reasonable cause to the police officers to believe that criminal acts had been committed out of their presence. The evidence shows that Pence was invited into the gathering which, in fact, was not seriously barred to anyone willing to contribute $5 for admission. Under these circumstances, a recording of conversations overheard through this radio eavesdropping device is not regarded as the product of an unlawful entry or unlawful search and seizure as protected against by the Fourth Amendment of the Constitution of the United States. Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed. 2d 312 (1966); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

We find no merit in the claim there was a violation of the Fourth Amendment to the Constitution of the United States.

Recent federal decisions have consistently held that evidence obtained by eavesdropping under conditions similar to the present was not secured through illegal search and seizure and the evidence obtained thereby was admissible. Koran v. United States, 408 F.2d 1321 (CA 5, 1969); United States v. Kaufer, 406 F.2d 550 (CA 2, 1969). The latter was affirmed in a per curiam opinion, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969).

See, also, Holt v. United States, 404 F.2d 914 (CA 10, 1968), cert. denied, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969).

 From all the aforesaid federal cases, a rule appears to have developed that testimony recorded by means of a "bugging device" is admissible in evidence in the absence of a trespass or unlawful entry upon the premises where the testimony recorded takes place. Tape recordings are admissible for the purpose of corroborating the testimony of a witness thereto

 In a *motion* therefor, respondent *sought additional particulars* in numerous instances with general reference to the names and whereabouts of witnesses and the sources and nature of their evidence which the Commission intended to use. This application was without merit and was properly overruled. The Commission treated this motion as a plea of vagueness and overruled it as requesting evidentiary detail, and held that the factual allegations, except with relation to respondent's disability, were sufficiently specific to fairly inform the respondent of the charges against him and of the nature of the facts sought to be proved so as to enable him to prepare his defense. In this we agree and point out that in the case of In re Novo, 196 La. 1072, 200 So. 466, 467 (1941), proceedings of this nature, it was held the technical niceties required in suits be-

tween private parties where the court is called upon to adjudicate conflicting claims is not essential, and all that is required is that the charges against the respondent shall be so specific as to fairly inform him of the misconduct of which he is accused. See, also: In re Mundy, 180 La. 1079, 158 So. 563, 565 (1934); State v. Flynn, 160 La. 483, 107 So. 314 (1926).

In the former case it was emphasized that:

"* * * a disbarment proceeding, being civil in its nature, was governed by the rules applicable to civil actions. *But this does not mean that the petition in a disbarment proceeding must be drawn with the same precision of statement or with the same adherence to the codal formalities or recognized technicalities of pleading that are required in petitions in civil suits. It is sufficient if the petition in such a proceeding fully and fairly informs the defendant of the charge or charges, so as to enable him to prepare his defense.*" (Emphasis supplied.)

See, also: In re Steiner, 199 La. 500, 6 So. 2d 641, 643 (1942); In re Mundy, 180 La. 1079, 158 So. 563, 565 (1934).

In a judicial-removal action, Stanley v. Jones, 197 La. 627, 2 So.2d 45, 52 (1941), the court, after stating:

"Where a petition is explicit in substantial particulars, there can be no just reason for maintaining that plaintiff's cause of action is vague. Godchaux v. Bauman, 44 La.Ann. 253, 10 So. 674. Verbal precision is not exacted and technicalities are not favored in our system of pleading. Regard is paid to the general force and meaning of the allegations, considered together; and when thus considered, they present a cause of action, and they should be given effect. Kellar v. Victoria Lumber Co., 45 La. Ann. 476, 12 So. 511,"

made this appropriate observation:

"*All that was required of plaintiff was to fairly inform defendant of the offenses with which he was charged so as to enable him to prepare his defense.*"

We make the same observation here as was made there:

"* * * that plaintiff has done this, and that the allegations of the petitions, taken together are sufficient to place defendant on his guard and not take him by surprise."

If there should have been any doubt about the sufficiency of the petition, it must be noted ample provision was made by the Commission that, should respondent have been actually surprised by any evidence tending to establish a particular delinquency, the Commission would consider and give effect to any motion by respondent for curative relief at the close of the evidence. This was done at the close of the hearing on May 23, 1970, when the

Commission reserved to respondent the right to request a supplementary hearing to enable him to produce further evidence in rebuttal or explanation of any such evidence adduced on behalf of the Commission or its executive officer. (This action gave respondent the advantage of having first heard the testimony several days in advance of the day on which he was required to produce proof on his behalf.) A hearing for that purpose was tentatively fixed for June 6, 1970. However, on June 1st, respondent notified the Commission that this further evidentiary hearing would be unnecessary if the Commission would permit the filing in evidence of nine exhibits in explanation of his numerous absences on court days as reflected by the minutes of his court. This offer was accepted by the Commission and the exhibits were ordered filed in accordance with respondent's request.

The respondent urged *a motion to quash* Rule VIII of the Commission on a basis that this rule was inconsistent with the rules of the Supreme Court which make provisions for a full and fair hearing.

The Supreme Court authorized the Commission to adopt rules of procedure for hearings before it "insofar as such rules provide a full and fair hearing." Rule XVII, Sec. 21, Supreme Court of Louisiana. Pursuant to this authority, the Commission adopted its Rule VIII, which pertinently provides: "The Commission

shall not be bound by the technical rules of evidence and may admit material and relevant evidence."

Respondent *moved to quash this rule* and requested that the Commission strictly adhere to the rules of criminal procedure, including evidentiary rules applicable thereto. Objection was made to some hearsay and opinion evidence as inadmissible in criminal proceedings. The ground for the motion and the objections is that judge-removal proceedings are "quasi-penal," as stated in State ex rel. Gremillion v. O'Hara, 252 La. 540, 211 So.2d 641 (1968).

In the first place, as already discussed, the present proceedings are *not* criminal proceedings but are civil in nature.

In the second place, the statute granting the Commission certain powers specifically authorized it to "require production of * * * evidence deemed *relevant* or *material* to the investigation or hearing." LSA–R.S. 13:36. (Emphasis supplied.)

Due process restrictions do not inhibit the Commission from adopting its Rule VIII, as specifically authorized by statute. "The hearsay evidence rule, with all its subtleties, anomalies, and ramifications, will not be read into the Fourteenth Amendment." Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 1098, 97 L.Ed. 1522 (1953). The trend of the law, particularly in nonjury situations, is to permit the consideration of all evidence logically proba-

tive of a matter required to be proved. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see 2 Davis, Administrative Law Treatise, Sec. 14.01 (1958).

As the cited Davis treatise notes, Sec. 14.10, the exclusionary rules of evidence, which have been tailored to the peculiar needs of juries, were designed for guiding admission or exclusion of evidence, not for weighing its reliability. Nor were they designed for quasi-judicial or administrative proceedings. In proceedings such as this, the reliability of evidence should be determined in light of the circumstances of each case, without regard to whether it should be considered inadmissible (as, for instance, hearsay) before a jury.

Under Rule VIII, the Commission is free to rely upon any evidence, if under the circumstances the evidence is found reliable, as well as relevant and material. Necessity for hearsay may justify its use, where for instance great practical inconvenience would be experienced in making the desired proof, such as by permitting a summary of many interviews or examinations rather than requiring each interviewer to testify or each document to be produced. Davis, Sec. 14.01; see, e. g., United States v. Mortimer, 118 F.2d 266 (CA 2, 1940), cert. denied, 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496 (1941), and Samuel H. Moss, Inc. v. FTC, 148 F.2d 378 (CA 2, 1945).

In the present proceedings, hearsay was relied upon in only two instances. We note, however, as the Commission noted, that, if this hearsay is excluded, then the respondent's regular association with Soto, the latter's criminal record, and his being engaged in illegal gambling activities is nevertheless proved without contradiction by the testimony of many of the witnesses, as well as partly by Soto's own admission. Occhipinti himself admitted to past business association with Carlos Marcello, although, hearsay excluded, his and Marcello's criminal reputation was not before the Commission. Nevertheless, the respondent's significant indebtedness to Occhipinti is proved by the latter's own testimony, and other evidence shows that his brother, Roy, was subject to pending felony charges before the respondent judge's section of criminal district court of New Orleans.

With this hearsay excluded, the finding of fact would be slightly modified, in the respects just noted.

*An exception of no cause of action* was urged as to Charges 1, 3, and 4 which pertain to respondent's participating and assisting in the organization of an assemblage for indecent purposes, in participating with others in the assemblage in the exhibition of certain lewd and obscene motion pictures as well as still pictures of that character, and in contributing financially to the cost of the assemblage.

As to the first of these, it was contended that the facts particularized as misconduct constituted off-duty activities not within the purview of a constitutional removal ground; as to the third and fourth, that the alleged facts were not sufficiently alleged as required by Rule XVII, Sec. 4 (b), of the Supreme Court, that is: "The notice shall specify in ordinary and concise language the charges against the judge and the alleged facts upon which such charges are based."

With respect to the first of these, the essence of respondent's contention is that the activities charged do not constitute "willful misconduct relating to his official duty." As already noted herein, the allegations include illegal gambling, participating in and assisting to organize an assemblage for indecent purposes, including the showing of obscene films and the procuring of women for purposes of prostitution and for the performance of indecent acts; in condoning criminal violations by others of the criminal laws of this State, associating with persons of known criminal records and reputations, as well as other off-duty activities which bring disgrace and discredit upon his judicial office and a loss of public respect and confidence in his ability and temperament to perform his duties.

There is no doubt but that the conduct and activities alleged and established by the record constitute violations of the standard of conduct required of a judge by both the Constitution and the Canons of Judicial Ethics adopted by the Supreme Court as binding upon members of the judiciary pursuant to its constitutional duty to supervise inferior courts. The conduct as constitutionally condemned and denounced is not "misconduct in office"; it is "misconduct relating to office." The term "relating to" implies not only misconduct of a judge while performing his judicial duties but activities relevant or pertinent to the performance of his duties and responsibilities, or having a connection or a logical or natural association with the performance of his duties and responsibilities. As defined in State ex rel. Gremillion v. O'Hara, 252 La. 540, 211 So. 2d 641, 648 (1968):

"'Misconduct', in general, is improper conduct or wrong behavior, but as used in speech and in law it implies that the conduct complained of was willed and intentional. It is more than that conduct which comes about by reason of error of judgment or lack of diligence. It involves intentional wrongdoing or total lack of concern for one's conduct. Whether or not an act constitutes misconduct must be determined from the facts surrounding the act, the nature of the act, and the intention of the actor."

In Stanley v. Jones, 201 La. 549, 9 So.2d 678, 683 (1942), a judicial-removal proceeding in which a judge was removed for

"gross misconduct" off the bench, as then denounced by a now-repealed prior constitutional provision, this court stated:

"The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well."

 The misconduct here charged and proved involves a persistent course of illegal behavior, which misconduct, without question, relates to and is logically and naturally connected with and bears upon and influences respondent in his office as judge of a criminal court. Such conduct is, moreover, sufficient to and does cast dishonor upon the judicial office, and cannot but be regarded as prejudicial to the administration of justice and to the popular respect for the judiciary. The off-bench behavior of a judge should not only be above reproach but such as to inspire confidence of the public in the judiciary. To consort with public gamblers and criminal characters, engage in heavy, habitual drinking in public, promote and be a part of a scandalous and sordid party in the company of prostitutes such as that held at

the motel, resist arrest and engage in fisticuffs with arresting officers, are hardly things to put the judicial branch in good repute. No doubt such misconduct is related to the official duties of the respondent.

Also urged was *a plea of vagueness.* This plea is without merit. No showing was made wherein the charges were vague or indefinite or in what manner their amplification would be necessary or even desirable.

For the reasons hereinabove noted, we find no merit in any of the pleas and exceptions; nor do we find that respondent was harmed or prejudiced by any of the Commission's rulings.

 As noted in State ex rel. Gremillion v. O'Hara, 252 La. 540, 211 So.2d 641 (1968), judicial-removal proceedings are quasi-penal in nature. Therefore, a judge under investigation is entitled to protection under the minimum standards of due process and the right of him and his witnesses to claim the privilege against self-incrimination, the right to counsel, and to the production of and the examination of witnesses. These rights were recognized in the rules of and in the hearings before the Commission. Respondent had the benefit thereof.

*On the merits,* the misconduct here concerned involves, as already noted, a persistent course of illegal behavior—public

gambling, participating in and assisting to organize an assemblage for grossly indecent and illegal purposes, personal association with persons of criminal reputation, including, as the evidence disclosed, a significant indebtedness to a person closely associated with a purported underworld character, and whose brother was charged with a felony assigned for trial in respondent's section of the criminal court. This misconduct was, in the Commission's opinion, as well as ours, "related to" respondent's office.

■■■ In reviewing this record we have ever been mindful of the premise that a decree of removal should not be imposed against a judge unless the proof is clear and convincing. Perez v. Meraux, 201 La. 498, 9 So.2d 662 (1942).

The facts and circumstances established in this record abundantly support the Commission's recommendations. The proof is clear and convincing.

An affair, an alleged "stag" party, purportedly a traditional bachelor's party, of intimate friends of Kenneth Reeves, in advance of his marriage, was held at the DeVille Motel on Tulane Avenue in the City of New Orleans on the evening and night of December 17, 1969. A raid on the party by a police vice squad precipitated an investigation which eventually culminated in the Commission's investigation · and finally in a recommendation that the respondent be removed from office.

There is no doubt that the party was for indecent purposes and that respondent participated and assisted in its organization. By his own admission, he contributed $5 before the party to assist in its arrangement and $10 after the party assembled. From the testimony of Brewer Pence, who was present at the party, and from the testimony of most of the participants who were called either by the chief executive officer of the Commission or by the respondent, it is clear that respondent as well as the other participants knew that the "stag" party was to assemble in the rooms to be secured for it in the DeVille Motel; that respondent brought the obscene films to the party, and that these pornographic motion pictures were shown at the party in the presence of those attending, including three prostitutes whom respondent brought to the party.

An effort was made to excuse the assemblage as a traditional bachelor's party of intimate friends in advance of the wedding of Kenneth Reeves. This does not appear to have been entirely ʳactually supported, for at least four strangers to Reeves— Brewer Pence, George Costello, Alceste Ory, and Al Miller—were admitted upon their payment of either $5 or $10. That this was, in fact, a bachelor's party, honoring one soon to be married, is somewhat incredible.

Respondent, however, claims that the films he brought to the party were brought at the request of *his court minute clerk*. The testimony of the participants in the party, particularly the testimony of Ory, the barber from whom the films were secured, and Max Williams, shows that respondent brought them to the party with full knowledge of their pornographic character.

While the Commission found the record did not support a finding that respondent knew or participated in the showing of obscene still photographs brought to the party by Harold William O'Brien, Jr., nevertheless the virtually uncontroverted testimony established respondent's participation as a member of the group in the showing and exhibiting of hard-core pornographic motion pictures at the assemblage.

Respondent freely admitted that he invited the three women to the party and that he accompanied them across the street from the Rowntowner to the DeVille Motel. This he accounts for as being a mere *joke*, and that he did not know the women were prostitutes. Although the testimony does not establish that either of the three had ever been convicted of offenses related to prostitution, *conviction* is not the only method by which it may be established that one is, in fact, a prostitute. It is incredible that respondent did not know the character of these women. It is unthinkable that, knowing the character of the party and the nature of the films to be shown, respondent

would have invited decent women to the party. The record leaves no room for doubt that these women were practicing one of the oldest and most dishonorable of the professions.

While many of the witnesses obviously hedged on the proposition when questioned, nevertheless, from the testimony of Malcolm Munday, Max Williams, Joan Clemens, and George Costello, there is no doubt that the women were present during the showing of the films. Moreover, the police informer testified that the respondent had, by prearrangement, personally procured these women to attend the party to put on an indecent show and for the purpose of prostitution. This, it was testified, he did upon O'Brien's failure in a mission assigned to him. Whether by prearrangement or otherwise, respondent's conduct in inviting and bringing these prostitutes to the party was improper. It was most reasonable to conclude their presence would lead to lewd and obscene public performances as well as to acts of prostitution.

Before coming to the party, the three women ordered dinner at the Rowntowner. If it should be conceded that their invitation and initial appearance at the party was a *joke,* their return to the party after dinner and remaining during the showing of the movies and until the police raid was *certainly no joke*; no one contends that it was.

During the raid, respondent's personal behavior was not that of a reasonable,˙ in-

nocent victim caught up in a raid. As the police raid began, respondent left the room in which the pornographic films were being shown. He continued in a fast walk or trot to leave the scene notwithstanding he was informed by a plainclothes officer that he was under arrest. He resisted the efforts of two uniformed officers to arrest him in the corridor about forty-two feet from the door of the room which he had just left. After a struggle with the officers he was brought back to the room. Nevertheless he tried to break away and precipitated a further struggle by striking one or more of the officers. To subdue him, it was necessary for the police to resort to physical force, the details of which are unnecessary to mention. This conduct was not compatible with innocence or respectable behavior due by a member of the judiciary even though he may have thought the arrest was technically illegal. . .

The record establishes that respondent participated in and condoned the participation by others in acts violating the criminal laws of this State relating to obscenity and involving the public showing of hard-core pornography at an assemblage where strangers were permitted admission upon the payment of a fee.

The record moreover establishes, through the virtually uncontradicted evidence of all witnesses, respondent regularly and frequently associated with Manuel Soto, a "bookie" or operator of an illegal handbook

to make racing bets, and that respondent bet with the "bookie" frequently in public and on an almost daily basis. His action in this respect showed to the public an apparent condonation of the illegal activities of the "bookie."

The record also establishes that respondent had a close relationship and frequent association with Frank Occhipinti, manager and part owner of the Rowntowner Motor Hotel across the street from the DeVille Motel. Occhipinti permitted respondent to become indebted at the hotel's bar and restaurant in an amount exceeding $1,700. It appears no request or demand for payment was made or that respondent was presented with a statement. Occhipinti himself admitted his business relationship with a purported underworld character of the New Orleans area.

During the period in which respondent became indebted unto Occhipinti, Occhipinti's brother's case was allotted to respondent's section of the Criminal District Court in February, 1969. Numerous motions in that prosecution were heard by respondent. No attempt was made for reassignment or reallotment of the case, nor did respondent recuse himself. The defendant in that prosecution frequently visited his brother at the Rowntowner where respondent often spent part of his time. This was a matter, as was respondent's association with Soto, about which respondent was questioned during a

preliminary investigation. Thus respondent had notice that these matters were subjects about which inquiries would be made in the subsequent investigation.

In addition, the proof establishes that respondent regularly, persistently, and frequently, over a period of years, participated in illegal gambling activities. He not only associated with Manuel Soto, as aforesaid, but placed bets with Soto frequently on an almost daily basis; and this he did publicly. This participation in illegal gambling activities was open and notorious, well known to all those who frequented the public bar of the DeVille. Respondent's activities and participation in these illegal acts could have no other effect than to encourage others to participate in similar activities without anticipation of prosecution therefor.

Through inquiry in a discovery deposition respondent's attention was directed to the fact that his conduct with reference to poker playing at the DeVille Motel would constitute a matter to be investigated. Evidence in the record indicates that, at these regular poker games, the big winner won as much as $200 nightly, and that many of the participants included several members of the bar who were practicing criminal law before respondent. The evidence, moreover, establishes that respondent was generally the winner, and that the winner paid the rental on the room utilized in the gambling operations. The usual rate was $12. Between June 24, 1969, and January 15, 1970, forty-four nights' room rental was charged to respondent as the winner.

Everyone elected to public office is required, before assuming the duties of that office or before being inducted into that office, to take the oath prescribed by the Constitution. Thus, in the course of being inducted into office, one swears or affirms that:

> "'* * * I will support the Constitution and laws of the United States and the Constitution and laws of this State; and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as [naming the office], according to the best of my ability and understanding. So help me God.'"

LSA–Const. Art. XIX, Sec. 1.

Respondent, as judge in the Criminal Court of the Parish of Orleans, had the sworn duty, under his oath of office, to support the Constitution and laws of this State. The laws which, by his oath he swore to uphold, include the laws with respect to pornographic literature as well as gambling activities through "bookies" and otherwise. His activities in those respects were not single or solitary instances but were continual over a period of years. His were persistent acts, of frequent occurrence. His acts were willful and intentional. He did what he willed or intended to do. A presumption exists to the effect that one pre-

sumes the consequences of his deliberate acts.

▆▆▆ The term "misconduct" implies a wrongful intention and not a mere error in judgment. Moreover, misconduct is improper or wrong conduct and, when intentionally or deliberately done, becomes willful misconduct. Misconduct in office is any unlawful behavior by a public officer in relation to the duties of his office, willful in character. Therefore, the frequent, flagrant, intentional, and deliberate violation by respondent of his oath of office, particularly with respect to the charges relating to gambling, pornography, and his participation therein in the manner heretofore noted, constitutes willful misconduct relating to his official duties.

The conclusion is inescapable that the basis and justification for carrying out the Commission's recommendations are established by strong and convincing evidence. Thus, the views we entertain are substantially the same as those of the Commission in unanimity which are stated in part:

" * * * that, on the whole, the respondent judge's public misconduct off the bench is so seriously delinquent as to bring disgrace and discredit upon the judicial office and a loss of public respect and confidence in his ability to perform his official duties impartially and conscientiously. The misconduct found is 'related' to his official duties, as involving public condonation of and participation in violation of the criminal laws the respondent judge is sworn to uphold. It also involves incidents, associations and general behavior prejudicial to the administration of criminal justice, as offering the opportunity for improper influence upon judicial actions and loss of public respect for the impartial administration of justice.

"In summary, perhaps none of the improprieties noted might be ground for removal by itself. Each perhaps might be subject to minimizing explanation as an isolated instance. In cumulation, however, they amount to a substantial pattern of willful misconduct related to official duty which casts a grave doubt upon the respondent judge's ability to perform his duties impartially and in accordance with law, charged as he is with upholding gambling, obscenity and other criminal laws, and with the duty to maintain public respect for the orderly and disinterested administration of criminal justice. The excessive absences and tardiness likewise reflect a willful neglect of official duty not conducive to public respect and to orderly performance of judicial process. In cumulation the delinquencies amount to a gross disregard of the judicial obligations as set forth by the Canons of Judicial Ethics adopted by the Supreme Court of Louisiana."

To this we add an observation by Justice Francois-Xavier Martin, a great Chief Justice of Louisiana, quoted by Justice Poche in State ex rel. Attorney General v. Lazarus, 39 La.Ann. 142, 1 So. 361, 376 (1887).

"'All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. *None should serve at its altar whose conduct is at variance with his obligations.*'" (Emphasis supplied.)

To this, Justice Poche added:

"The trust to enforce this lesson of wisdom has been confided to the supreme court, and, although the task is unpleasant, it must be performed impartially and fearlessly."

Hence, for the reasons assigned:

It is ordered, adjudged, and decreed that the respondent, Judge Edward A. Haggerty, Jr., of the Criminal District Court for the Parish of Orleans, State of Louisiana, be, and he is hereby, removed from office; and that the office be, and it is hereby, declared vacant.

TATE, J., recused.

HAMITER, Chief Justice (dissenting).

While I do not and cannot approve or condone the alleged illegal and, perhaps, immoral conduct of Judge Haggerty, I do not find that it has interfered in any manner with his handling of the dockets and cases in Section "C" of the Criminal District Court of the Parish of Orleans over which he presides. It pertained only to his private life; not to his official duties, as is reprobated by Article IX, Section 4 of the Louisiana Constitution of 1921. This constitutional provision, insofar as pertinent here, states: "Grounds for removal or involuntary retirement. A justice or judge may be removed from office or retired involuntarily *for wilful misconduct relating to his official duty or wilful and persistent failure to perform his duty, * * *.*" (Italics mine.)

Numerous witnesses, all prominent business and professional persons, testified favorably in behalf of the respondent judge before the Judiciary Commission (it recommended the removal of Judge Haggerty). Among those, as well as some of their testimony, were as follows:

Mr. Severn T. Darden, former District Attorney of Orleans Parish:

"Q. Do you know other people in the community who know Judge Haggerty also?

A. Yes, I do.

Q. Amongst those people what is his general reputation for being an industrious and fair-minded judge?

A. I would say it's excellent. Certainly on the basis of my observations it's been very excellent. * * *"

Mr. John E. Jackson, Attorney:

"Q. Have you ever heard Judge Haggerty's reputation as being a fair-minded and industrious judge discussed, Mr. Jackson?

A. I haven't heard it discussed controversially. I've heard it observed that he was a fair-minded and honest judge.

\* \* \* \* \* \*

Q. Have you ever heard his reputation for promptness and attendance in his Court discussed?

A. I've never practiced in the criminal courts in New Orleans, and I have never heard any adverse criticisms of the Judge's conduct of his Court, any absence of decorum in his Court, any situation of the lack of attention to the business of the Court."

Mr. John E. Morrill, Retired:

"Q. Mr. Morrill, what is your present business or occupation?

A. I was Head of the Sewerage and Water Board, but I retired the other day.

Q. I see, and for how long had you been Head of the Sewerage and Water Board?

A. Oh 20 years.

Q. Mr. Morrill, do you know Judge Edward A. Haggerty, Jr.?

A. Yes, I know the Judge and his family for years and years.

Q. Do you know other people in this community who know the Judge?

A. Yes, I do.

Q. Amongst those people who know him what is his general reputation for being a fair-minded and industrious judge?

A. I have always considered him a fair-minded and industrious judge.

Q. And do other people consider him that?

A. He has that reputation in my learning."

Mr. Clem H. Sehrt, Attorney:

"Q. Mr. Sehrt, of course, you're an attorney. How long have you been an attorney?

A. Well I've been active practitioner since 1932.

Q. Do you know Judge Edward A. Haggerty, Jr.?

A. I know Judge Edward A. Haggerty intimately since the first year prior to his coming out of Law School.

Q. Do you know lot of people in the community who know him?

A. Well, I know many, many, many people who know him. I'd like to say more than you're asking me questions leading up to being a character witness. Am I confined to those questions?

Q. No. I'm going to ask you personal questions, too.

A. All right.

Q. So you can feel free to elaborate, but getting to the character question. Amongst those people who know him what is his reputation for being industrious, hard-working, fair-minded judge?

A. Excellent.

Q. Among those people have you ever heard it discussed that he conducts himself in such a manner as to bring disgrace and discredit upon his judicial office and that results in the loss of public respect and confidence in his ability to perform his duties? Has that ever been discussed?

A. I have never discussed that with any member of the Bar, and no one has ever asked me any such things about Judge Haggerty.

Q. Now what is your personal observation of Judge Haggerty as a judge and as an individual?

A. Well I think he handled probably the Shaw case, probably the most difficult criminal case that's been before any court in this state in the last 50 year or 25 years. I think he handled it admirably and I think the entire Bar of the State of Louisiana applauds him for the manner in which he handled it. That's just one example.

\* \* \* \* \* \*

Q. Was there anything else you wanted to add?

A. Well I'd like to say this, that through the years during Ed's period as an Assistant District Attorney I met him many, many times. I've been out with him socially. I'm a member of New Orleans Athletic Club. He is, too. I have met him socially in other places, and it would be good to say it, I've been to the races with him on occasion, and frankly I think besides having illustrious family background he has upheld it as a man and as a citizen and as a judge and as an assistant district attorney.

\* \* \* \* \* \*

Q. Viewing obscene movies in the presence of others, men and women and attorneys who practice in his Court?

A. Well I have never gone to events to view obscene movies, but I'd have to tell you that it's been a known practice in this United States. I've never paid to go view them, but I guess if you discredited every man who viewed them we'd have a list so long it would be pitiful, and if this is done in a private situation, if it's conducted quietly, if this is not a thing that public affairs put on page one. I happened to know that that happened ten years, fifteen years ago in this community. The entire City Council was at Lenfant's Restaurant, and the showing of nude pictures of women and men, what not, were being shown. The whole Council was there. You'd have to condemn the entire City Council. The Mayor was

there. He left before the police came and made the arrest. It's a common practice in America. Now whether it's good or bad, I don't know. In Sweden they do it in public."

Mr. Paul Burke, Postmaster, New Orleans:

"Q. Mr. Burke, what is your present occupation or profession?

A. I'm Postmaster, the City of New Orleans.

\* \* \* \* \* \*

Q. Were you at one time councilman for the City of New Orleans?

A. Yes, Sir, for eight years.

Q. Do you know Judge Edward A. Haggerty, Jr.?

A. Yes, Sir.

Q. How long have you known him?

A. 25–30 years.

Q. Do you know other people who know him?

A. Yes, Sir.

Q. What is his reputation in the community for being a fair-minded and hard-working judge?

A. I think his reputation is highly esteemed by everyone that knows him well.

Q. Mr. Burke, have you ever heard it discussed that Judge Haggerty's activities have brought disgrace and discredit to the

judicial office and that resulted in a loss of public respect and confidence in his ability to perform his duties?

A. Stated to me, no, Sir."

Raymond F. Hufft:

"Q. General, would you state your present position or occupation, please.

A. I am regional commissioner of the United States Customs and my region includes Louisiana, Alabama, Mississippi, Arkansas, Tennessee, and Tampa, Florida West.

Q. And how long have you held that position, sir?

A. I have been in that capacity for eight years.

Q. And prior to that what was your occupation?

A. I am a partner in the insurance company of Drury and Hufft, and prior to that I served eight years as the adjutant general of the State of Louisiana and the director of Selective Service for the State of Louisiana.

Q. General, you know Judge Edward Haggerty, do you not?

Q. How long have you known him?

A. I have known the judge for approximately thirty years.

Q. How well or how intimately have you known him?

A. I am—well, I was his best man when he was married and I am a fraternity brother of his.

Q. Do you know other people in this community who know Judge Haggerty?

A. Yes, I do.

Q. Among those other people in the community what is the Judge's general reputation for sobriety?

A. He is known to be a good judge, he—

 * * * * * *

Q. I didn't mean as regards his capacity as a judge, I mean with regard to sobriety, being a sober individual.

A. Well, I see the judge in church on Sunday mornings, before I moved down to Belle Chasse I was his neighbor, I have been in his company socially for years and years and I would say his character is good, his character is excellent.

Q. Now, with regard to his reputation as being an industrious and sober judge, what would you say his reputation in the community is?

A. Real good."

Particularly impressive was the testimony of Honorable Jim Garrison, the present District Attorney of Orleans Parish who has held that position for more than eight years and is and has been unfriendly with Judge Haggerty. He observed:

"Q. I don't mean to insult you, but you've been somewhat of a controversial District Attorney having problems on occasions with judges. So it would interest me to know your opinion of Judge Haggerty as a judge.

A. First I'd have to say that I think we have a very good Bench out there across the board, but if you would draw a line, put all the judges in vertical order and draw a line say at the median in the middle of the line, you would have to put Judge Haggerty in the upper part because of his experience. I would say that is no reflection on any of the other judges out there to say that he's definitely one of the better judges.

Q. Has your office had any particular difficulty with the handling of docket in Judge Haggerty's section, Section 'C'?

A. There's never been any in eight years.

 * * * * * *

Q. Now Judge Haggerty was the Presiding Judge in the famous trial of the State of Louisiana versus Clay Shaw?

A. Yes.

Q. It would be fair to say it was a case that you were particularly interested in?

A. Yes.

Q. You paid particular attention to the handling of this case?

A. Yes, I did.

Q. What would be your reaction to Judge Haggerty's handling of that matter?

A. *I will repeat. I'll simply repeat what I have said before on a number of instances that this was the most distinguished work on the part of a District Judge that I have ever seen since I've been a lawyer.*

Q. Let me ask you this. You're familiar with the elections in the Parish of Orleans, City of New Orleans, generally?

A. Yes.

Q. Do you know whether or not Judge Haggerty's position comes up for vote by the public in short order?

A. It comes up in 1972.

Q. What is Judge Haggerty's general reputation insofar as being a fair-minded and industrious judge?

A. His general reputation is that he is both fair-minded and industrious.

 * * * * * *

Q. Have you ever had occasion to hear Judge Haggerty's reputation as to whether or not he's an industrious judge discussed?

A. Mr. LeCorgne, I have not heard it discussed in a positive way. I'm more conscious of it being taken for granted in the sense that it has never come up. For example, if you were to ask me to cite an instance there, I don't think I could.

Q. Have you ever had occasion to hear Judge Haggerty's reputation for absence and tardiness in this Court discussed?

A. I have heard of his being late on two occasions in the last eight years. There may be more. I'm conscious of his being late on two occasions.

Q. How about his absences?

A. A complete absence?

Q. Yes.

A. I'm not conscious of a complete absence.

Q. On any occasion?

A. No, I'm not.

Q. Well, Mr. Garrison, if I told you that one of your Assistant District Attorneys has testified that from the period of September 11, 1968 through January 9, 1969 Judge Haggerty was late or absent on 21 occasions?

A. Is this a District Attorney in that section?

Q. Yes.

A. I would say two things. First certainly that he should know better than I, being in that section, but on the other hand, until this operation I was there everyday, and he should have come in and made such complaint, and no such complaint was made to me because I would have talked to the Judge because we have never had any trouble com-

municating, and this is the sort of thing that I would feel no hesitancy about going down to his Chambers and discussing, but no such complaint was ever made to me.

\* \* \* \* \* \*

Q. If I tell you that another assistant district attorney testified for the period August 4th, 1969 through December 11th, 1969 Court was not held in Section 'C' of the Criminal District Court by Judge Haggerty on 17 occasions, would you say that this, coupled with the other absences and tardiness which I mentioned, indicates an industrious judge to you?

A. I cannot answer yes or no. I will answer it this way, and if it's not satisfactory, I will try and give you more. As you knew since I have been District Attorney I have publicly exhibited a concern with regard to productivity of the Courts, and on one occasion it even brought me into conflict with the judges. I have to say with regard to Judge Haggerty I have never had called to my attention any systematic absence or failure to do his job.

\* \* \* \* \* \*

Q. Do you think it's proper for a judge who publicly bets in a handbook and who observes obscene movies and watches obscene movies in the presence of others at a party is a proper person to sit in judgment on those types of cases?

A. Well of course I don't, but let me add this I do not know of any judges out there who are making improper decisions in those kinds of cases, and that would be what I would be concerned about as District Attorney.

Q. Mr. Garrison, if I told you that from the period of December 11, 1967 through April 20, 1970 Court was not held \* \* in Section 'C' of Criminal District Court for 108 days, would you say that that indicates an industrious judge?

A. I don't think you can draw a conclusion, Mr. LeCorgne, by counting the entire number of days of the year because for the simple reason that if you count the Court holidays and if you count the other days of the year which Court is not held it's surprising how many days you come up with. I can only reply to that that we have not had a problem of productivity with regard to Section 'C'.

\* \* \* \* \* \*

Q. Mr. Garrison, have you ever heard discussed the fact or the lack of that fact that Judge Haggerty's behavior has resulted in a loss of public respect and confidence in his ability to do his duty? Have you heard that matter discussed?

A. No. I think I would have to say that the off-duty life and the on-Bench life were capsulated.

Q. That they were capsulated?

A. That one never leads into the other.

\* \* \* \* \* \*

Q. Mr. Garrison, do I understand you to state that in the presence of Judge Haggerty you feel that his off-duty life should be separated entirely from his on-duty life?

A. I'm saying that it has been. In other words, assuming that what I have heard is true that he drinks more than other people off-duty, there has been no evidence of it on the Bench as far as I'm concerned, and there are many people who can drink at night and still work more productively in the day than other people, and I make that point because I'm very conscious of the years of his experience in the Courtroom. For example if I were to ask a Judge in the Criminal District Court a question about evidence, although the other judges are experienced, a number of them, I would go first to Judge Haggerty because he is the most knowledgable in evidence on the Bench out there.

Q. Are you in a position to because of having heard discussions of this, are you in a position to state whether as a matter of general reputation in the community the off-duty affairs that you mentioned may have affected his on-duty affairs?

A. I think I would be in such a position, and I will say that I don't think it will affect his duty.

Q. And you don't think it has in the general reputation of the community itself?

A. No, I don't think.

\* \* \* \* \* \*

Q. Mr. Garrison, Judge Haggerty furnished this Commission a Sworn Statement on March 5th, 1970, which has been offered and introduced and filed in evidence as CEO–22 in which he says, and I quote: '\* \* \* It's common knowledge, not rumor, common knowledge around the Criminal District Court that Mr. Garrison knowingly permitted Mr. Alcock and Mr. Alford to file these charges with the hope that he may have another judgeship for his friend Governor McKeithen to fill.'

A. I will reply to that by saying it was with the deepest reluctance that I took the charges, and I will go further and say that it would be a pronounced loss to the Criminal District Court if it were to lose Judge Haggerty because of his experience. That was my position at that time and it is now."

The foregoing testimony, I think, completely refutes the primary charge of 1. L (found by the Commission to be proved) which reads: "CHARGE 1. L., IN CONDUCTING YOURSELF IN SUCH A MANNER AS TO BRING DISGRACE AND DISCREDIT UPON THE JUDICIAL OFFICE WHICH YOU HOLD, RESULTING IN A LOSS OF PUBLIC

RESPECT AND CONFIDENCE IN YOUR ABILITY TO PERFORM YOUR DUTIES."

Insofar as the charge of Judge Haggerty's placing bets with the "bookies" (one relied on heavily by the Commission) I must say that such activity is no more illegal than betting at the New Orleans Fair Grounds or other licensed race tracks in the state. In my opinion all are prohibited by Article XIX, Section 8 of the Louisiana Constitution of 1921 which plainly recites: "Gambling is a vice and the Legislature *shall* pass laws to *suppress it.*" (See my dissenting opinion in Gandolfo et al. v. Louisiana Racing Commission et al., 227 La. 45, 78 So.2d. 504.) (Italics mine.)

In conclusion, I quote with approval the following from the brief filed in this court by the respondent judge: "In fact with regard to the entire Charge 1 L it should be pointed out that there is not one instance in the record where anyone testified that any conduct of the respondent judge had brought disgrace and discredit upon the office which he holds. To the contrary many of the witnesses who testified on behalf of the respondent judge clearly answered that they had never heard discussed that his conduct had brought disgrace and discredit upon the judicial office which he holds, or resulted in a loss of public respect and confidence in his ability to perform his duties. More affirmatively many testified that they had held the judge in the highest regard. * * *

" * * * If a judge offered no explanation for this four-month absence, it could well be assumed that the absence constituted a *willful* and persistent failure to perform his duties. If, on the other hand, the judge can show that two of those months he was recuperating from a heart attack and for the other two months he was hospitalized as a result of an automobile accident, it could hardly be said that his persistent failure to perform his duties was *willful* failure. Therefore, it would appear clear to the writer that the judiciary commission errs when it finds the respondent judge willfully failed to perform his duties by being absent and late. The fact that the respondent judge has not willfully failed to perform his duties and that he has actually timely and adequately disposed of the cases allotted to his section can be borne out further when one remembers the fact that during the trial of the celebrated Shaw Case, his fellow judges suggested that he be taken out of the allotment, so that he would receive no new cases during the forty days of this trial. This, he refused and despite the fact that the trial lasted forty days and he could handle no other matters, his docket still compares more than favorably with his fellow judges. The writer thinks that this speaks

eloquently against any allegation that he has failed to perform his duties by either being late or absent on occasion. * * *

" * * *

"The issue before this Honorable Court is simply; whether or not the personal conduct of Judge Edward A. Haggerty, Jr. is such as to warrant his removal from office. * * * Nowhere in the record is it indicated or even intimated, that any off bench activity of the respondent judge ever affected his behavior on the bench. To the contrary, the record is replete with testimony as to the judge's ability, competence, industry, and fair-mindedness. Personal behavior that may not fit the norms and standards of one hundred percent of the community cannot, in the writer's opinion, possibly warrant wiping out a most admirable judicial career that has exceeded 13 years; and a career that has included more than 25 years of public service in a judicial, prosecutive and military career. It is suggested that the respondent judge was first elected in July of 1956. He was reelected in 1960 for a full 12 year term, which would end on December 31st, 1972. His plurality in that election was in excess of 80,000 votes. Having served this many years in the previously mentioned capacities, it would seem that the choice should be left to the people of his district to determine whether he should be retained.

It is now just about two years before the people will be able to make such a decision."

I respectfully dissent.

Rehearing denied.

HAMITER, C. J., dissents from the refusal of a rehearing, he adhering to his reasons in his previous dissent.