JUSTICE NELSON
specially concurs.
¶88 I concur in our Opinion as to Issues 1, 2, 3, 4, 5, and 8. As to Issues 6 and 7,1 specially concur. I begin by addressing Issue 6.
¶89 While Smartt did not make this argument, I nonetheless have some concern about whether the present Montana Canons of Judicial Ethics (Canons) can serve as the basis for actual disciplinary action against any member of Montana’s judiciary. Like Montana’s former system for disciplining lawyers (See Goldstein v. Commission on Practice, 2000 MT 8, ¶ 61, 297 Mont. 493, ¶ 61, 995 P.2d 923, ¶ 61 (Nelson, J., dissenting)), Montana is the only state in the Union that subscribes to the antiquated Canons. There is a strong argument that these Canons are aspirational only; that they are neither prohibitory nor directive. And, for that reason, it is questionable whether the violation of one or more of these Canons can serve as the basis for actually disciplining a judge.
¶90 Basically, the problem is this: saying that a person “should” or “should not” do something arguably leaves the decision to engage in or to not engage in the referenced conduct up to the person. That is wholly different than actually requiring the person to act or to refrain from acting in a certain manner by use of terms such as “shall,” *526 “must,” “shall not,” or “must not.” But, first some history.
¶91 Currently, Montana subscribes to the Canons as its “proper guide and reminder for judges.” MONTANA CANONS OF JUDICIAL ETHICS, Preface. Although these Canons were adopted in Montana on May 1, 1963, the Canons themselves were originally written in 1908 and later adopted by the American Bar Association (ABA) in 1924. Walter P. Armstrong, Jr., The (1972) Code of Judicial Conduct, 26 Sw. L.J. 708, 708 (1972) (hereinafter Armstrong) (discussing history of the Model Code of Judicial Conduct). Other than the addition of Canon 35 in 1980 regarding improper publicizing of court proceedings, the Montana Canons themselves remain for the most part unchanged from their original version written almost a century ago. See Armstrong, at 708-10 (discussing amendments to the Canons made in the 1930's and 1950's).
¶92 By contrast, in the late 1960's there was a national movement to revise the 1924 Canons because those Canons failed to address a number of modern issues that frequently faced judges. For example, the Special Committee on Standards of Judicial Conduct appointed by the ABA in 1969 found that the Canons “dealt with inadequately or not at all... conflict of interest, financial reporting and public disclosure, and non-adjudicatory activities of judges such as law teaching and serving as officers or directors of business corporations.” Armstrong, at 712-13 (quoting 95 A.B.A. Rep. 1048 (1970)). After extensive discussion and input, the ABA unanimously adopted the Model Code of Judicial Conduct (Code) in 1972. Armstrong, at 715, 723.
¶93 The 1972 Code was again revised in 1990 with the addition of a Preamble, gender neutral language, and other changes intended to make the Code clearer. Lisa L. MILORD, The Development OF THE ABA JUDICIAL Code 7-8 (1992). Changes regarding judicial campaign conduct were made in 1997 and 1999. ABA MODEL CODE OF JUDICIAL CONDUCT, 8, 25 (2000) (hereinafter ABA MODEL CODE). Currently, 49 states have adopted either the 1972 Code or one of the versions of the 1990 Code. JEFFREY M. SHAMAN ETAL., JUDICIAL CONDUCT AND ETHICS, § 1.02 at 3-5 (3d ed. 2000) (hereinafter SHAMAN). Consequently, Montana is the only state that has failed to consider whether the 1924 Canons adequately provide both guidance to judges and notice to the public about what they can expect from judges.
¶94 As already noted, Smartt did not raise on appeal the issue of this Court’s ability to enforce the Canons. That omission aside, I believe there are good reasons why this Court should consider adopting the modem Code.
¶95 First, there is the jurisdictional question mentioned above-i.e. under the present Canons, Montana judges are neither unambiguously *527 required to nor prohibited from engaging in any referenced conduct. The wording of the 1924 Canons is entirely aspirational. No conduct is actually proscribed or required, and, therefore, no conduct or omission is punishable. As already mentioned, the preface to Montana’s Canons states that they are simply a “proper guide and reminder for judges.” (Emphasis added). The Canons at issue here-Nos. 1, 4 and 34, set out in full at ¶ 72, of our Opinion-follow the theme of “guiding” and “reminding” the judge.
¶96 For example, Canon 1 states that when a person becomes a judge he assumes various unspecified “duties” in respect to his personal conduct which concern his relations with various categories of persons. The Canon fails to state what “duties” the judge assumes and neither requires nor prohibits any actual conduct in the performance of those duties.
¶97 Canons 4 and 34 speak in terms of conduct a judge “should” do or avoid. Again, by way of example, these Canons require that the judge’s “everyday life” and “every particular [of] his conduct” ... “should be” ... “above [or] beyond reproach.” This language begs the question: what is supposed to happen if the judge’s “everyday life” is not “beyond reproach?” What if, for instance, the judge does a good job on the bench, but drinks too much, gambles, doesn’t maintain his yard, openly swears at his neighbor’s yapping dog, and humiliates his wife in public? Is his everyday life “beyond reproach?” Canon 34 specifies that the judge “should be” ... “courteous, patient, [and] punctual.” What if the judge isn’t? Do the Canons require this sort of conduct to be punished for failure to comply?
¶98 In a more serious vein, what if the judge uses his office time and government-funded computer to view pornography? What if the judge is convicted of DUI? What if the judge habitually shoots from the hip, rules from the gut and ignores the law? What if the judge sits on the board of directors of a corporation that is “cooking its books?” Arguably these involve conduct that Canons 4 and 34 say the judge “should be free from” or “should avoid.” But what if the judge does not? Where do the Canons actually prohibit this sort of conduct? Plainly, they do not.
¶99 A leading treatise on judicial ethics notes that some commentators believe the Canons were intended to be an ideal guide to behavior rather than an enforceable set of rules, while the Code is designed to be a mandatory and enforceable set of rules. SHAMAN, § 1.02 at 3.
¶100 For example, the 1924 Canons use the word “should,” while the modern Code distinguishes conduct into three categories using “shall,” “should” and “may.” The Preamble to the Code specifically states that use of the word “shall” indicates mandatory conduct the violation of which subjects a judge to possible discipline; “should” is hortatory and *528 is used for suggested conduct not subject to discipline; and “may” is used for discretionary conduct. Preamble, ABAMODEL CODE. The Code also notes that judicial disciplinary procedures should comport with the requirements of due process. Preamble, ABA MODEL CODE, n.l.
¶101 Our own jurisprudence bears out this distinction between mandatory terms and those that are merely discretionary. “Must” and “shall” are mandatory rather than permissive. Montco v. Simonich (1997), 285 Mont. 280, 287, 947 P.2d 1047, 1051 (citation omitted). “The word ‘may’ is commonly understood to be permissive or discretionary. ... In contrast, ‘shall’ is understood to be compelling or mandatory.” Gaustad v. City of Columbus (1994), 265 Mont. 379, 381-82, 877 P.2d 470, 471 (internal citations omitted). See also MONTANA Legislative Services Division Bill Drafting Manual 2-5 (2002) (“Avoid using will, should, and ought. ... Use ‘shall’ when imposing a duty on a person.”)
¶102 This issue-whether the Canons are merely suggested guidelines rather than enforceable rules-was raised in a number of states before the modern Code was written. For example, in Nix v. Standing Committee on Judicial Performance (Okla. 1966), 422 P.2d 203, 207, the court stated, “[t]his Court adopted the Canons in the spirit in which they were suggested, that is, to serve as models of emulation, not as purported rules, laws or judicial fiat.” See also In re Haggerty (La. 1970), 241 So.2d 469, 474 (“The Canons of Judicial Ethics do not, of themselves, have the force and effect of law.”).
¶103 In contrast, however, other states have held that the Canons are enforceable, just as the Rules of Professional Conduct are enforceable for lawyers. Jenkins v. Oregon State Bar (Or. 1965), 405 P.2d 525,527 (rules of professional conduct, including judicial conduct, are binding upon judges; there would be no purpose in adopting “merely hortatory’ Canons); Mahoning County Bar Ass’n v. Franko (Ohio 1958), 151 N.E.2d 17, 23 (Supreme Court has jurisdiction over the discipline of judge for acts committed injudicial capacity which are in violation of the Canons of Judicial Ethics). See also In re Sheffield (Ala. 1984), 465 So.2d 350, 355 (discussing the 1972 version of the Code that used the word “should” instead of “shall,” holding that the “Canons are not merely guidelines for properjudicial conduct [but]... have the force and effect of law.”).
¶104 In contravention to this latter line of authority, however, the Montana Rules of Professional Conduct (which govern the professional conduct of attorneys) are written in mandatory terms-a lawyer “shall” or “shall not” engage in certain specified conduct. There are exceptions, and those prove the general rule. For example, Rule 6.1, regardingpro bono publico service, is aspirational. This rule states that a lawyer *529 “should” render a certain number of hours of legal services each year without expectation of a fee. Similarly, other Rules allow, but do not mandate conduct-a lawyer “may” do certain things. See Rules 6.3,6.4, 7.2, and 7.4.
¶105 By adopting the modern Code, Montana would preempt any question of whether the Canons provide this Court with jurisdiction to discipline judges and whether the Canons are merely aspirational or are mandatory.
¶106 Second, the Canons are entirely composed in the masculine gender using “he,” “his” or “him,” while the current Code uses gender-neutral language. Consequently, the Canons are in conflict with this Court’s policy against gender discrimination and with the Montana Legislative Council policy to use gender-neutral language in bills. Montana Judicial Branch Policies and Procedures, Nondiscrimination Policy 200 (2002); In re State Bar of Montana’s Gender Fairness Steering Committee, Oct. 21,1999 (adopting Gender Fairness Task Force Final Report); MONTANA LEGISLATIVE SERVICES Division Bill Drafting Manual 2-11 (2002).
¶107 Third, the modern Code is structured in a clear and understandable manner, while the 1924 Canons contain ambiguous and overly general provisions-the language of Canons 1,4 and 34 cited in our Opinion being prime examples. See also Round Table Discussions on the Proposed Code of Judicial Conduct, 9 SAN DIEGO L. REV. 785 (1972).
¶108 Fourth, the Code contains specific provisions for part-time judges which the Canons do not. This is especially important in a state like Montana, which has numerous part-time judges serving in our courts of limited jurisdiction.
¶ 109 Fifth, the Code addresses modern issues that are not addressed in the Canons. These issues include situations that are likely to face Montana’s judiciary such as conflicts of interest, financial reporting and public disclosure, and the non-adjudicatory business activities of judges.
¶110 Finally, by adopting the modern Code, both judges and the public will have the added guidance of the commentary that is included as part of the Code and the benefit of the interpretive case law from the 49 states that have adopted the Code.
¶111 It is worth noting that each time the subject of judicial conduct has been addressed on a national level, there was an instance of conduct that caused widespread concern among the public. In the early 1920's, federal Judge Kenesaw Mountain Landis engaged in private employment while receiving a government salary. Soon after his censure, the ABA adopted the Canons of Judicial Ethics. Armstrong, *530 at 709. In the late 1960's, an unnamed federal judge, who later resigned, accepted a $20,000 payment from the family foundation of a financier who was a personal friend while that financier was under investigation for violation of federal securities laws. Subsequently, the ABA appointed the Special Committee on Standards of Judicial Conduct and later adopted the Model Code of Judicial Conduct. Armstrong, at 712.
¶112 Similarly, I suggest that Smartt’s case has focused substantial public and professional scrutiny on the incident of judicial misconduct at issue here. Because of the matters discussed above and, of necessity, our application of the Canons to Smartt’s actions, I believe that it is now time to question whether Montana’s Canons of Judicial Ethics adequately provide the Judicial Standards Commission and this Court with an irrefutable source of jurisdiction for disciplining judges; adequately provide clear and understandable rules of professional conduct for members of the judiciary; take into account modern issues that frequently face judges; and serve to maintain and enhance the public’s confidence in an independent, fair, and competent judiciary. I suggest that, at best, the Canons provide weak, equivocal and antiquated answers to these questions. Therefore, I submit that the Court consider adopting the Code and that in doing so, we join all of our sister states in a common code of ethics for members of the judiciary.
¶113 Turning next to Issue 7, I agree that the sanction which we have imposed is appropriate. I do not agree with all that is stated in ¶ 81. Certainly one function of judicial disciplinary proceedings is “to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public from further excesses.” Contrary to our Opinion, however, I believe that an important focus of judicial disciplinary proceedings is also to punish the individual judge.
¶114 In the context of our Canons being aspirational rather than prohibitory and directive, not focusing on punishment is, understandably, the best we can do with the rules we have. Adoption of the Code would solve this problem. That said, when a member of the judiciary engages in clear violations of the rules that govern his or her professional conduct and responsibility, he or she should be punished. We punish lawyers by censure, admonition, suspension or disbarment if they violate the Rules of Professional Conduct. Indeed, the Rules for Lawyer Disciplinary Enforcement (both the 2002 and pre-2002 versions) are designed for that purpose-to investigate, prosecute and punish lawyers who violate the Rules of Professional Conduct. Why is it that judges should be treated differently? In my view, they should not be.
*531 ¶115 Moreover, in all of this we have seemingly missed the point that taxpayers do not furnish judges (or other public officials and employees, for that matter) with offices and equipment to facilitate their viewing of pornography. Furthermore, judges are not supposed to be advising known fugitives from justice to lay low and avoid attracting attention, a fact Smartt does not dispute. If anything, Smartt should have turned Dye into the authorities. Aside from being incredibly stupid, this sort of conduct is wrong by anyone’s standards. A judge should be punished for behaving in this fashion. In fact, punishing the judge is probably the best way of restoring and maintaining the dignity, honor, and impartiality of the judicial office, and protecting the public from further excesses. At least the taxpayer will see that this sort of behavior will not be tolerated and members of the judiciary will see that individual judges who violate their rules of professional responsibility and conduct will bear an appropriate sanction for their misdeeds.
¶116 With the above, I concur in our Opinion.